T.I.P. Holding No. 2 Corporation, Appellant, v Florence A. Wicks, Individually and as Executrix of John A. Wicks, Jr., Deceased, et al., Respondents.

Second Department, July 31, 1978

### APPEARANCES OF COUNSEL

*Hartman & Craven (Bertram Perkel, Victor M. Metsch* and *Gary H. Shapiro* of counsel), for appellant.

*Gehrig, Ritter, Coffey, McHale & McBride (Patrick J. Shooltz* of counsel), for respondents.

### OPINION OF THE COURT

SHAPIRO, J.

At Special Term, plaintiff-appellant moved for summary judgment and defendants-respondents cross-moved for summary judgment in their favor. Special Term denied plaintiff's motion and granted defendants' cross motion. We affirm.

On July 30, 1976 respondents and appellant's assignor, Omega Shopping Centers Inc. (Omega), entered into an agreement, on the standard New York Board of Underwriters form of contract of sale, whereby respondents agreed to sell and Omega agreed to purchase a parcel of land of some 26½ acres in Jericho, Town of Oyster Bay, for the sum of $3,375,000. The agreement provided that this sum was payable as follows:

"TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS on signing of contract, by check subject to collection, receipt of which is hereby acknowledged;

"TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS by cash or certified check within ninety (90) days from the date of this contract;

"FIFTY THOUSAND ($50,000.00) DOLLARS upon adoption of the zoning resolution as set forth in Paragraph 32 hereof;

"TWO HUNDRED THIRTY-SEVEN THOUSAND FIVE HUNDRED ($237,500.00) DOLLARS upon receipt of site plan approval, curb cut approvals, and all other necessary municipal approvals and permits to permit commencement of construction of the proposed structure as herein set forth, subject to all applicable state and municipal code and ordinances, but no later than eighteen (18) months from the date hereof;

"THREE MILLION THIRTY-SEVEN THOUSAND FIVE HUNDRED ($3,-037,500.00) DOLLARS on closing of title herein by cash or good certified check which closing will take place as hereinafter provided."

Despite these unequivocal provisions as to the manner in which the installment payments were to be made, Omega was not, in fact, obligated to make *any* payments other than the initial sum of $25,000 paid upon execution of the agreement. This lack of obligation to make any subsequent payment was clearly spelled out in various paragraphs of a lengthy rider, consisting of 20 paragraphs numbered 28 through 47.

The relevant paragraphs of the rider are:

"28. This sale is expressly contingent upon the Purchaser's ability to obtain a change in the zoning classification of the said property so as to permit construction thereon of retail stores containing a gross floor area of not less than 450,000 square feet of building together with the necessary accessory parking.

"29. The Purchaser shall have a period of ninety (90) days from the date of this contract to conduct the necessary feasibility studies, site plans, traffic plans, engineering and architectural requirements as well as the necessary demographic studies in order to determine the feasibility for development of the premises for purposes of retail stores. The Purchaser agrees that it will immediately undertake such studies and if within a period of ninety (90) days from the date hereof, the Purchaser shall determine that such project is unfeasible or unadvisable within the discretion of the Purchaser, *then and in that event the Purchaser may cancel this contract and the Seller shall be entitled to retain the $25,000 paid on the signing hereof as and for liquidated damages.* Such a cancellation shall be exercised within the ninety (90) day period by service of notice as hereinafter provided.

"30. In the event that the Purchaser should determine that the project is feasible, then and in that event the Purchaser shall deposit with the Seller an additional sum of $25,000 as hereinbefore set forth in the main body of this contract (said payment to be made within the ninety (90) day period as set forth in the next preceding paragraph hereof).

"31. The Purchaser, within nine (9) months from the date hereof, will apply to any and all * * * governmental * * * agencies * * * to obtain the necessary zoning classifications and/or special use permits so as to permit the construction on the premises of retail stores containing not less than 450,000 gross square feet of building floor area with accessory parking in accordance with designs, plans and specifications adopted by the Purchaser * * * In the event that the Purchaser is unable to obtain a rezoning of the property * * * as aforementioned within eighteen (18) months from the date hereof * * * *the Purchaser shall at its option have the right to cancel this contract in which event all money theretofore paid under this contract shall be retained by the Seller for the consideration of withholding the premises from sale on the open market.*

"32. The Purchaser agrees to pay to the Seller upon the effective date of a resolution adopted by the Town Board of the Town of Oyster Bay rezoning the premises to the zoning classification permitting the construction of the project aforementioned, the additional sum of $50,000.00 as hereinbefore set forth in the printed portion of this contract. In any and all events, however, the said sum of $50,000.00 shall be paid within one (1) year from the date hereof irrespective of whether or not the said rezoning resolution shall have been adopted. The payment of such funds shall not be deemed in any way to satisfy the contingency for site plan approval, zoning approvals and the obtaining of any and all other permits necessary to construct the building on the premises herein. The Purchaser shall continue to expeditiously process the application for rezoning, site plan approval and any and all other necessary permits for the construction of the project. It is however understood and agreed that in the event this contract is cancelled by the Purchaser at a point of time more than one (1) year from the date hereof, then and in that event the Seller shall be entitled to retain the additional $50,000.00 in the event of cancellation of this contract as and for liquidated damages.

"33. In any and all events, all contingencies set forth hereunder shall be fully met within eighteen months from the date of this contract and title shall close on or before eighteen months from the date hereof unless the Purchaser shall have cancelled this contract by reason of inability to fulfill the contingencies herein or if the closing date under this contract is extended in the event of litigation prohibiting construction as provided in the next succeeding paragraph hereof.

\* \* \*

"35. *In the event of any default by the Purchaser hereunder, the sole liability of the Purchaser shall be limited to the retention by the Seller of the amount paid by the Purchaser on account of the* purchase price as liquidated damages and the Purchaser shall not be liable for any other expenses, costs, damages or for specific performance and in such event, this contract shall be deemed terminated and of no further force and effect"[1] (emphasis supplied).

Thus, pursuant to the agreement, the second installment of $25,000 was due 90 days after August 25, 1976, *if Omega chose to make such payment.* Pursuant to paragraph 29, Omega had that period of time to conduct its feasibility studies, prepare site plans, etc., to determine to its own satisfaction that the project was feasible. If it decided that it was not, it was not required to pay anything further, in which case respondents were "entitled to retain the $25,000 paid on the signing \* \* \* as and for liquidated damages."

On the other hand, if Omega determined that the project was feasible, it was required to pay an additional sum of $25,000 within 90 days from August 25, 1976. After that payment, paragraph 31 of the agreement took effect. It provided that: (a) within nine months from August 25, 1976, i.e., by May 25, 1977, Omega (if it desired to ultimately proceed to the next stage) was to file an application for the specified rezoning; and (b) if Omega were unable to obtain the rezoning within 18 months from August 25, 1976, i.e., by February 25, 1978, Omega could then *"at its option have the right to cancel this contract* in which event all money theretofore paid under this contract shall be retained by the Seller for the considera-

---

1. The agreement further stated that it was subject to a right of first refusal held by a third party. The agreement became effective as of August 25, 1976, at which time Omega received notice from respondents that said third party had declined to exercise its right of first refusal.

tion of withholding the premises from sale on the open market"[2] (emphasis supplied).

By paragraph 32 Omega agreed to pay respondents the additional sum of $50,000 upon the effective date of successful rezoning of the premises by the agreed date, February 25, 1978. However, respondents were not required to wait until that time for the payment of the $50,000, for paragraph 32 also provided that "[i]n any and all events, however, the said sum of $50,000.00 shall be paid within one (1) year from the date hereof irrespective of whether or not the said rezoning resolution shall have been adopted." Paragraph 32 further provided that "in the event this contract is cancelled by the Purchaser * * * more than one (1) year from the date hereof * * * the Seller shall be entitled to retain the additional $50,000.00 * * * as and for liquidated damages."

Thus, the procedures set forth in the agreement are quite clear:

Stage 1: Omega paid $25,000 at the time of the signing of the agreement in return for the privilege of having the premises kept off the market for 90 days and for its right to determine whether it would go on to the next stage; if it decided not to, respondents were entitled to retain the $25,-000.

Stage 2: Upon payment of an additional sum of $25,000 within said 90-day period, Omega had until May 25, 1977 to file its application for rezoning; if it decided not to so file, respondents would retain the entire $50,000 previously paid.

State 3: If the zoning application were timely filed (as it was), Omega had until February 25, 1978 (i.e., 18 months following the effective date of the contract) to procure the rezoning; if it were not so procured, respondents would retain all sums previously paid no matter what the amount was (unless Omega nevertheless chose to purchase the premises).

Alternate Stage 3: However, for the contract to remain viable Omega was required to make an additional $50,000 payment by August 25, 1977, even though its rezoning application might still then be pending and undertermined. Failure to make such payment would trigger the default provisions of paragraph 35, to wit, that the sums previously paid by Omega

---

2. What this meant, apparently, was that if Omega was willing to purchase the premises for the stated sum despite its failure to obtain rezoning, it had the right to do so.

would be retained by respondents, and Omega would be left with the solace that it would "not be liable for any other expenses, costs, damages or for specific performance".

Omega did pay the second installment of $25,000 and did file its zoning application prior to the May 25, 1977 deadline therefor, although it appears that it did not follow this up by filing the necessary site plans, architect's drawings and specifications. Pursuant to the agreement the next payment to be made by Omega would be the sum of $50,000, due by August 25, 1977 (one year from the effective date of the agreement). Such payment was not made by that date. Omega's assignee, the appellant here, which took the assignment of the contract after Omega was already in default, tendered payment of the $50,000 on September 2, 1977, seven days after its due date. Respondents refused to accept it.

Appellant contends that the provisions of the agreement spell out a contract of sale and, since time was not made of the essence, the installment payments could properly be made within a reasonable time after their respective due dates. Respondents' position is that the two payments succeeding the one made at the time of the signing of the contract were required to be made no later than the specified dates, just as would be the case where an agreement is labeled an option.

The gist of appellant's argument is that the agreement must be determined to be *either* a contract of sale or an *option,* and that the terminology used in the various printed clauses of the standard New York Board of Underwriters form of contract of sale, as well as that used in the rider, demonstrate that it was a contract of sale and not an option to purchase. From this base, appellant then argues that the requirements of successive payments took on the protective mantle of the general rule that time is not of the essence in a contract for the sale of real property.

We reject appellant's "either-or" contention, for a determination of the meaning of the language used by the parties should be based on the basic purpose underlying the contract and should not be foreclosed by a rigid or formalistic reading without regard to the realities of the situation. We perceive no reason why parties may not formulate their agreement in whatever manner seems most apt to them and why they may not decide, as they did here, to embody within one document both an option and a contract to purchase, thus obviating the necessity for a second execution and delivery of documents

prior to title closing.[3] To the extent that the payment provision relating to the option portion was not adhered to by Omega, the rules generally applicable to options should apply, to wit, that such provisions must be complied with strictly in the manner and within the time specified (*Boal v Smith,* 35 AD2d 730, affd 29 NY2d 518; *Manhattan Gear & Instrument Co. v 2350 Linden Blvd. Corp.,* 27 AD2d 570). To the extent that its provisions relate to delivery of title (such as inability to perform on the law date), the general rule that time is not of the essence would be applicable (see, e.g., *Ballen v Potter,* 251 NY 224; *Lese v Lamprecht,* 196 NY 32).

■ The contract here, in clear and unambiguous language, stated that $50,000 was to be paid on or before August 25, 1977. The land, which had been evaluated at $3,375,000 in the contract (assuming rezoning could be obtained), had been held off the market by its owners for a period of one year, for which the sum of $50,000 was paid. Omega had no obligation to complete the purchase or to make any payments beyond that sum during the first year. To continue to have the right to bar respondents from placing the property back on the market, if it desired to do so, it was obligated to pay an additional $50,000 by August 25, 1977. Respondents had no right to seek specific performance and no right to insist that site plans, etc., be expeditiously filed; in short, they had no right to demand anything at all from Omega. They could only sit by and passively wait to see whether they would receive $50,000 by August 25, 1977. If they did not, the sole consequence of the nonreceipt of that sum by that day was the automatic termination of Omega's rights under the contract without any recourse of any kind against it. In plain effect, those provisions constituted an option, pure and simple.

Appellant argues that such phrases as "default by the purchaser", "liquidated damages", "option [of Omega] to cancel this contract", are all contrary to the concept of an option. However, that verbiage was used in the framework of a document that played a dual role, to wit, a contract of sale as well as an option, so that it is not surprising that conceptual terms usually relating to a contract of sale would infiltrate the "option" portion of the agreement. In any event, labels aside, in determining the legal effect of the document signed by respondents and Omega we must look to the essentials of

---

3. It is not uncommon for an option to purchase to be contained in a lease. The instrument does not thereby become either a lease or an option—it is both.

the agreement. Thus analyzed, it seems clear that the first installments to be paid by Omega were in consideration of its being given an option for a limited time to carry out the next stage of the enterprise. While the phraseology used in describing a glass as half full or half empty is factually different, analytically the result is the same. Similarly, here, whether we read the various provisions of the agreement as "options to cancel" or "options to continue" is devoid of legal or factual significance; they are one and the same thing.

There are here no equities analogous to those present in *J. N. A. Realty Corp. v Cross Bay Chelsea* (42 NY2d 392). In the first place, the failure of Omega to tender $50,000 by August 25, 1977 was not an inadvertence.[4] Secondly, the moneys Omega had spent for the rezoning application (which it did not diligently pursue), as well as the $50,000 paid to respondents, were entirely different in nature from those spent by the tenant Cross Bay (in *J. N. A. Realty Corp. v Cross Bay Chelsea, supra)* in improving the demised premises. Cross Bay's exercise of its option to renew merely required a notice to that effect, not the tender of further moneys, and its landlord had every reason to know, to a certainty, that Cross Bay intended to renew.

Here, on the other hand, a multimillion dollar property had been taken off the market for a full year. The sum of $50,000 paid by Omega was the sum paid by it for the privilege, during that time, of determining whether it would proceed further with its contemplated purchase. There is no greater reason why the duration of that privilege should be extended beyond the time set forth in the agreement, than there would be in the usual option to purchase. For $50,000 paid to respondents, Omega obtained a regular, not a baker's dozen of months to decide whether it would opt in or out. By not paying by August 25, 1977 it opted out. Thus we agree with appellant's statement in its brief that "[i]f this Court finds, as

---

4. In this connection, and as a factual basis for sustaining the dismissal of appellant's complaint, it should be noted that respondents assert that the day after Omega failed to make the $50,000 payment due on August 25, 1977, its principal, Warren L. Schwerin, in trying to work out a new deal with a purchase price of $2,650,000 instead of the original purchase price of $3,375,000, told their lawyer that "to put up $50,000 under the old contract would be insane". Appellant, which took an assignment of the contract after Omega was already in default, has not seen fit to submit an affidavit by Mr. Schwerin, either in support of its own motion or in opposition to respondents' cross motion, which in any way even attempted to deny that verbatim statement.

did Special Term, that the agreement was but an option, then Appellant agrees that 'time is of the essence' and the failure of Appellant to accept the option by August 25, 1977 allowed the option to expire in accordance with its terms" and that "[r]espondents accordingly were entitled to summary judgment."

The judgment of Special Term which dismissed the complaint upon the granting of respondents' cross motion for summary judgment, should therefore be affirmed.

COHALAN, J. (dissenting). In this action for specific performance, plaintiff appeals from a judgment of the Supreme Court, Nassau County, entered January 18, 1978, which dismissed its complaint upon the denial of its motion for summary judgment and the granting of defendants' cross motion for summary judgment. I vote to reverse, to grant plaintiff's motion for summary judgment for the relief demanded in the complaint, and to deny the cross motion of defendants for summary judgment dismissing the complaint.

Omega Shopping Centers, Inc. (Omega), assignor of plaintiff-appellant, and the defendants-respondents executed a contract of purchase and sale for certain real property located in Nassau County. The original date of the contract was July 30, 1976, but it was subsequently altered to take effect on August 25, 1976.

By its terms Omega was to make certain payments on certain due dates. Two payments of $25,000 each were made pursuant to the agreement. A third payment—this one of $50,000—was due on August 25, 1977. On the day before, Omega's president (Mr. Schwerin) sent a letter to the attorneys for the defendants, in the apparent belief that as a result of a telephone call an amendment to the sale contract had been agreed upon. An immediate written response came from the sellers that no such amendatory agreement had been reached. Prior to the communications, negotiations looking to a modification of the purchase price or a novation had been in discussion for almost two months.

The plaintiff, as assignee, on September 2, 1977, caused a check for $50,000 to be delivered to cover the August 25, 1977 payment, which check was rejected. The sellers contended that all plaintiff had was an option which had not been exercised.

Thus, the issue presented in this case is whether we are

dealing with an option to buy, or a contract of sale of real property. If it is an option, pure and simple, then I would vote for affirmance. In my view, however, the underlying instrument is a contract of sale.

In *Benedict v Pincus* (191 NY 377, 382-383), Judge Vann defined an option as: "an exclusive privilege to buy and a contract for an option is the agreement by which the privilege is created. Sometimes it is defined as a continuing offer, binding for the time specified the one who makes it, but not the one to whom it is made, unless he accepts when it becomes binding upon both. It neither transfers, nor agrees to transfer title to property, but confers the bare right to accept an offer within the time limited and upon the terms provided. No obligation is assumed by the holder of an option and no promise is made in the contract therefor except by the one making the offer or granting the privilege and the words used are wholly his own. While there are two parties, it is unilateral in form and nature and is signed by but one, the other becoming a party by paying the consideration and accepting the instrument."

At bar the instrument is a standard form of contract of sale of real property with a rider of 20 numbered provisions attached.

The facts are more extensively set forth in the majority opinion and I would merely add that, with respect to the application for a change of zone and certain construction on the premises, a footnote to the rider states: "Seller shall cooperate with Purchaser in the processing of such applications and Purchaser may appeal from any adverse decisions with respect thereto." The sellers did co-operate to the extent of joining in the application for a change of zone to permit commercial use.

The paragraph of chief concern in the rider (No. 32) has to do with the $50,000 payment due on August 25, 1977. In pertinent part, that paragraph reads: "The Purchaser agrees to pay to the Seller upon the effective date of a resolution adopted by the Town Board of the Town of Oyster Bay rezoning the premises to the zoning classification permitting the construction of the project aforementioned, the additional sum of $50,000.00 as hereinbefore set forth in the printed portion of this contract. *In any and all events, however, the said sum of $50,000.00 shall be paid within one (1) year* from the date hereof irrespective of whether or not the said rezon-

ing resolution shall have been adopted * * * The Purchaser shall continue to expeditiously process the application for rezoning, site plan approval and any and all other necessary permits for the construction of the project" (emphasis supplied).

In passing it should be noted that such unconditional promises to make a future payment and to pursue rezoning and construction approval are clearly inconsistent with the status of an option holder who assumes no promissory obligation prior to his exercise of the option (*Benedict v Pincus,* 191 NY 377, 382, *supra*).

The language of the rider then continues: "It is however understood and agreed that in the event this contract is cancelled by the Purchaser at a point of time more than one (1) year from the date hereof, then and in that event the Seller shall be entitled to retain the additional $50,000.00 in the event of cancellation of this contract as and for liquidated damages." Similarly, liquidated damages play no part in the option process. Such damages would flow only from nonperformance of a contract to the detriment of the seller. Here, the purchaser is presumably ready, willing and able to perform and seeks judicial approval to do so.

The fact that the purchaser's stated agreement to complete the purchase was conditioned on an event not wholly within its own volition, does not prevent the existence of a valid bilateral contract of purchase and sale (1A Corbin, Contracts, § 274). The highest court of our sister State, California, found no lack of mutuality of obligation where the purchaser's promise was conditioned on his finding "satisfactory" tenants (*Mattei v Hopper,* 51 Cal 2d 119) or on his own approval of the developmental plan proposed by the municipality (*Rodriguez v Barnett,* 52 Cal 2d 154).

Concededly, as in all real estate contracts wherever a change of zone or a variance is required to assure the purchaser that he will enjoy the anticipated use of the property, there are escape clauses in the contract. At bar, the purchaser was not buying "a pig in a poke". It wanted the land for a particular use, and absent the granting of permission for that use, could refuse to consummate the transaction. That more truly represented the happening of a condition or a contingency, not the exercise or nonexercise of an option.

There came a time in this case when the contingencies were met—or were in the process of being met—to the satisfaction

of the purchaser, and it was willing to continue making the payments. Because Omega's president thought the property was overpriced he attempted to negotiate the sale price downward as noted above. The negotiations were still going forward when the date arrived for the $50,000 payment.

Curiously enough the defendants (one of them an attorney), dealt during this critical period with a layman (Mr. Schwerin) rather than with his (Omega) corporation's attorney. However sophisticated a layman may be in matters of real estate, he is not presumed to have a knowledge of the law to the degree possessed by an attorney of long experience such as Mr. McBride. Here Omega's president was led down the primrose path while time, according to the sellers, was running out.

Even the rider—which defendants claim takes the agreement out of the contract of sale category and into the realm of an option—is studded with references to "contract", "seller", "purchaser", "agreement" and "purchase price". In fact, every one of the clauses in the rider has at least one of the words set out above in quotation marks. In the face of such verbiage only Humpty Dumpty could say that "[w]hen I use a word * * * 'it means just what I choose it to mean—neither more nor less.' " (Carroll, Through the Looking Glass, ch 6.)

Ordinarily I would agree that when two presumably skillful real estate attorneys sit down at a table to hammer out an agreement, neither should seek to take refuge in the principle enunciated in *67 Wall St. Co. v Franklin Nat. Bank* (37 NY2d 245), i.e., that if ambiguities exist in a contract they should be read against the one who prepared it. But where—as here—the scrivener sellers' attorney employed words of art in a 20 paragraph rider, all of them couched in contract of sale terms, he should not be permitted to claim that his manifest intent was to speak in terms of option. Intent plays a great part here and can be judged only by the terms employed. "The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed" *(Atwater & Co. v Panama R. R. Co.,* 246 NY 519, 524).

From all the welter of words, there emerges, in my view, the inescapable conclusion that the parties were speaking "contract", not "option".

If, then, the instrument is a contract of sale, time is not of the essence. Hence, a seven-day delay, occasioned as it was by the continuing negotiations, should not be fatal to the plain-

tiff's case, Equity should relieve the default in view of the $50,000 already paid to the sellers (see *J. N. A. Realty Corp. v Cross Bay Chelsea,* 42 NY2d 392; *Lese v Lamprecht,* 196 NY 32). Further, since nothing appears in the record to indicate any prejudice to the defendants, the judgment should be reversed, and plaintiff's motion for summary judgment granted.

To effectuate the decision, plaintiff should, within 20 days after entry of the order to be made herein, reproffer the $50,000 third payment to the defendants. Upon the receipt of the payment the contract of sale should be deemed resumed and the parties should proceed to its consummation in accordance with its terms.

MARTUSCELLO, J. P., and MARGETT, J., concur with SHAPIRO, J.; COHALAN, J., dissents and votes to reverse the judgment, grant plaintiff's motion for summary judgment and deny defendants' cross motion for summary judgment, with an opinion.

Judgment of the Supreme Court, Nassau County, entered January 18, 1978, affirmed, with $50 costs and disbursements.