510 F.2d 837
 KAMA RIPPA MUSIC, INC., Plaintiff-Appellant,
v.
Ms. Melanie SCHEKERYK, Defendant-Appellee,
and
Ms. Melanie Schekeryk and Peter Schekeryk, Individually and
d/b/a Amelanie Music, Defendants.
Melanie SCHEKERYK, Counterclaimant-Appellee,
and
Ms. Melanie Schekeryk and Peter Schekeryk, Individually and
d/b/a Amelaine Music and Two People Music, Counterclaimants,
v.
KAMA RIPPA MUSIC, INC., Counterdefendant-Appellant,
and
Kama Sutra Music, Inc. and Buddah Records, Inc., Counterdefendants.
 No. 472, Docket 74--2153.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 6, 1975.
Decided Feb. 10, 1975.
 
 Fred J. Halsey, Jr., New York City (Emil, Kobrin, Klein & Garbus, New York City, Martin Garbus, Renee J. Roberts and Thomas D. Selz, New York City, of counsel), for plaintiff-appellant.
 Sandor Frankel, New York City, for defendant-appellee.
 Before SMITH, OAKES and TIMBERS, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 Kama Rippa Music, Inc., a plaintiff seeking specific performance of its recording agreement with a popular songwriter and performer, appeals from an order of partial summary judgment against it. By memorandum opinion of June 17, 1974, the United States District Court for the Southern District of New York, Whitman Knapp, Judge, entered on July 18, 1974 an order and judgment summarily granting the defendant artist-composer, Ms. Melanie Schekeryk--better known as 'Melanie'--the declaratory and injunctive relief requested in two counterclaims. Thus, finding that Kama Rippa had failed to pay royalties to Melanie within the time limitations established by the parties' contract, the court declared that the rights to compositions submitted by Melanie under the contract had reverted to her and enjoined Kama Rippa from representing that it retains any interest in these compositions or trying to collect royalties on them. Federal jurisdiction over the claims is based on diversity of citizenship, 28 U.S.C. § 1332, with New York law governing by prior contractual agreement of the parties; and this court's jurisdiction with related claims pending in the district court relies upon the district court's express determination of no just reason for delay and its express direction to enter final judgment on its order, as required by Fed.R.Civ.P. 54(b). The appellant offers three independent grounds for overturning Judge Knapp's order: The court misconstrued the parties' contractual obligations; the appellant's failure to fulfill its part of the agreement is excused due to impossibility of performance; and the court's declaration that Kama Rippa had forfeited the composition rights ignores fundamental equitable considerations. We conclude that the district court committed none of the alleged errors in its adjudication of the two counterclaims, and affirm the judgment below.
 
 I. BACKGROUND OF THE DISPUTE
 
 2
 In May, 1968, Melanie signed a contract ('Songwriter's Agreement') with Kama Rippa under which Melanie would deliver musical compositions to Kama Rippa, which would publish them and divide the resulting royalties with Melanie. Various riders were soon appended to the agreement and one figures prominently in this appeal. This rider to paragraph six, set forth in the margin,[1] makes payment of royalties to Melanie 'of the essence,' limits the excuses for failure to make timely payment to acts of nature and the like, and penalizes unexcused failures of this sort by a reversion to Melanie of the full rights to the compositions.
 
 
 3
 Within a few months, Melanie contracted with another member of 'The Kama Sutra Group,' Buddah Records, to record various of her compositions for release by Buddah. By May, 1971, sufficient friction had developed between the parties to induce Melanie to sign with Paramount Records; Melanie's settlement with Buddah, however, allowed the latter to retain the rights relating to any recordings to date.
 
 
 4
 Melanie also undertook about that time to settle her further obligations to Kama Rippa under the Songwriter's Agreement. The resultant 'Letter Agreement' of August, 1971, required Melanie to deliver 20 musical compositions and to 'record' within two years of the agreement at least three of the 20. Joint Appendix at 201A. In addition, if Melanie did not meet her recording obligation, she would pay Kama Rippa liquidated damages of $25,000 per unfinished recording, and Kama Rippa would be obliged to treat such payments 'as full compensation and the sole remedy for any failure by Melanie Schekeryk to record musical compositions in accordance with the provisions of this Agreement.' Id. at 202A. The Letter Agreement established Melanie's rights in the 20 compositions by reference to the Songwriter's Agreement and another agreement (not of immediate interest), 'including, without limitation, any causes of action or counterclaims that they (Melanie and her publishing partnership) may have arising out of same.' Id.
 
 
 5
 A signal that trouble lurked on the horizon came in February, 1973, when Kama Rippa neglected to pay Melanie her share of the royalties due, under the Songwriter's Agreement, 'on or about each February 15th.' After an insistent letter by Melanie, Kama Rippa did meet its February obligations in March. By August 15, the next due date, however, the parties' differences had surfaced all too clearly and Kama Rippa's deferral of payment had no element of accident in it. The events culminating in the litigation now in part before us began with a series of letters from Kama Rippa to Melanie. These charged that Melanie had breached the Letter Agreement by recording but not also releasing three songs. Kama Rippa met Melanie's disclaimer of any such obligation by withholding the royalties due in August. Melanie sent written notice to Kama Rippa of its tardiness as the predicate (prescribed by the rider to paragraph six of the Songwriter's Agreement) to pursuing her remedies for untimely payment. On August 31, Kama Rippa filed suit in federal district court for specific performance of Melanie's alleged obligation to release three songs. Melanie accompanied her general denial of the complaint with numerous counterclaims and moved for summary judgment on various of the latter. In mid-September, Kama Rippa reiterated its still-undecided claim in a suit filed in New York state court and successfully invoked N.Y.Civ.Prac.R. 6212(a) (McKinney 1963)[2] to obtain a court order attaching almost its entire indebtedness to Melanie. Subsequently, Kama Rippa justified its refusal to pay Melanie in terms of its inability to defy a court order--this attachment secured on Kama Rippa's own motion. When the state court finally vacated its order on technical grounds,[3] Kama Rippa mailed off a check to Melanie for the sum owed. But the 30-day grace period after which forfeiture of composition rights would, if properly invoked, transpire had already long since run. And the district court, while deferring a ruling on the complaint until after an evidentiary hearing, found that forfeiture had indeed been properly invoked by Melanie's counterclaims and, accordingly, granted her the requested declaratory and injunctive relief.
 
 II. CONSTRUCTION OF CONTRACTUAL OBLIGATIONS
 
 6
 Kama Rippa maintains that Melanie's right to the royalties guaranteed her under the Songwriter's Agreement is contingent upon performance of her duties under the subsequent Letter Agreement. The district court did not so find and Kama Rippa attributes this to the court's allegedly erroneous refusal to consider evidence extrinsic to the written agreements in determining their meaning.
 
 
 7
 The appellant attempts to establish this basis for reversal with various arguments so vague and amorphous as to engender doubts about Kama Rippa's own confidence in their substance. The apparent thrust of its 'Point I' is that the district court ignored the interdependence of the Songwriter's Agreement and Letter Agreement in construing them.[4] This argument fails for its fictitious characterization of the district court's analysis, which plainly did reconcile the two agreements in arriving at the conclusion that Kama Rippa's duty to pay royalties and Melanie's to 'record' three songs--whatever that may ultimately be determined to require--were not mutually dependent. See Joint Appendix at 422--424A. The ultimate good sense of the district court's reconciliation of the two agreements, moreover, should be apparent from the most cursory consideration of the Letter Agreement's provisions, quoted supra, that liquidated damages would be the 'sole' remedy for Melanie's breach of her obligation to 'record' three songs and that Melanie's rights in the 20 new compositions include all claims arising out of the Songwriter's Agreement.
 
 
 8
 ' Point II' of the appellant's brief, that Kama Rippa was wrongfully denied the opportunity to present extrinsic evidence to explain ambiguous contractual language, also rests upon a specious characterization: that the agreements contain ambiguities requiring clarification by extrinsic evidence. Kama Rippa quite extensively cites authority for considering extrinsic evidence of subjective intent to plumb the meaning of ambiguous language. See, e.g., Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987 (S.D.N.Y.1968). It neglects to isolate, however, any ambiguity besetting the critical language in the Letter Agreement discussed immediately above or, with minor exception,[5] the all-important rider to paragraph six. Kama Rippa's attempt to clothe this argument in innocent trappings, moreover, should not be allowed to obscure its effort to vary, rather than elucidate, the terms of an agreement by extrinsic evidence--an activity which courts have repeatedly refused to indulge. See, e.g., Pink v. American Surety Co. of New York, 283 N.Y. 290, 296, 28 N.E.2d 842 (1940). The district court acted correctly, therefore, in excluding evidence offered to prove custom and usage in the industry, for Kama Rippa offered it to belie the clear objective intent of the provision authorizing forfeiture rather than to shed light on any ambiguities in the provision.
 
 
 9
 Nor does the heterogeneous mix of attacks on the judgment collected under Kama Rippa's 'Point III' bring the validity of the district court's construction of the parties' contractual obligations into serious question. Thus, the court's reliance on cases indicating that the language in a rider takes precedence over the printed parts of the contract resists the appellant's attempt to limit the cases cited to their specific facts. Of the three cases noted by the court, Kratzenstein v. Western Assurance Co., 116 N.Y. 54, 22 N.E. 221 (1889); Robertson v. Charles Frohman, Inc., 198 App.Div. 782, 191 N.Y.S. 55 (1st Dept. 1921), appeal dismissed, 233 N.Y. 530, 135 N.E. 905 (1922); Collins v. Knuth, 51 App.Div. 188, 64 N.Y.S. 549 (2d Dept. 1900), only Robertson could even arguably be so distinguished. In addition, the appellant's objection fails to grapple with the numerous other cases which the court very properly might have cited for support. See, e.g., Chadsey v. Guion,97 N.Y. 333 (1884); Feldman v. Fiat Estates, Inc., 25 A.D.2d 750, 268 N.Y.S.2d 949 (2d Dept. 1966). Similarly insubstantial is the appellant's challenge to the court's consideration of the parties' conduct as a guide in construing the agreements. In concluding its analysis that Melanie's right to receive royalties was independent of her duty to 'record,' the court sought to dispel 'any lingering doubt' about this holding by reconstructing the parties' 'practical interpretation' of their duties. Shortly before the expiration of the 30-day grace period, Kama Rippa obtained the court order attaching its indebtedness to Melanie; and Kama Rippa paid off the debt on the day that the attachment became ineffective. Joint Appendix at 424A. Although the parties' apparent construction of the agreement, as evidenced by this conduct, would not necessarily bind the court, it is obviously information which a court seeking to resolve any ambiguities in a contract would rightly wish to consider. Brooklyn Public Library v. City of New York, 250 N.Y. 495, 500--501, 166 N.E. 179 (1929). In the instant case, Kama Rippa's conduct strongly suggests that it understood that its duty to pay royalties was independent of Melanie's to 'record,' and the district court could properly marshal this evidence of practical interpretation to support its construction of the parties' obligations.
 
 
 10
 As the district court found, Kama Rippa's obligation to make royalty payments under the Songwriter's Agreement and Melanie's to 'record' three songs under the Letter Agreement are independent of one another. Melanie's possible breach of her duty, the subject of proceedings pending in the district court, would not excuse Kama Rippa's failure to perform its duty. The court's exclusion of extrinsic evidence was warranted in view of the objective clarity of the instruments. Since resolution of this interdependence claim placed no material issue of fact in genuine dispute, summary judgment was appropriate in this respect. Fed.R.Civ.P. 56(c).
 
 III. IMPOSSIBILITY
 
 11
 The appellant also seeks to justify its late payment on grounds of force majeure: Payment was 'impossible,' in the contractual sense, 6 A. Corbin, Contracts § 1325 (2d ed. 1962), because it would involve violation of a court order. Since this court order, an attachment of Kama Rippa's indebtedness to Melanie, was procured by Kama Rippa itself, a defense of impossibility is as audacious as it is frivolous.
 
 
 12
 The party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract. 407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp., 23 N.Y.2d 275, 281--282, 296 N.Y.S.2d 338, 343--344, 244 N.E.2d 37 (1968); Cameron-Hawn Realty Co. v. City of Albany, 207 N.Y. 377, 381, 101 N.E. 162 (1913); Standard Oil Co. of New York v. Central Dredging Co., 225 App.Div. 407, 410, 233 N.Y.S. 279, 282 (3d Dept.), aff'd mem., 252 N.Y. 545, 170 N.E. 137 (1929). To recognize impossibility where, as in the case before us, the party pleading the defense has intentionally incapacitated itself from performing would defy this case law and all good sense. Cf., Spanos v. Skouras Theatres Corp., 364 F.2d 161, 168--169 (2d Cir.) (en banc), cert. denied, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966). In allowing a party to attach its own indebtedness, therefore, the New York legislature could not have intended that the party exploit the court's order of attachment to avoid its contractual obligations.[6]
 
 
 13
 The district court correctly held that Kama Rippa could not bootstrap an attachment order imposed on Kama Rippa's own motion into a contractual defense of impossibility. The attachment of its indebtedness to Melanie thus in no way excused the appellant's failure to pay Melanie her share of the royalties on time.
 
 IV. THE INEQUITY OF FORFEITURE
 
 14
 The appellant's two remaining defenses invoke equitable considerations in its behalf. First, Kama Rippa contends that the district court cannot, under accepted principles of restitution law, order forfeiture until Melanie compensates Kama Rippa for its expenditures on the musical compositions, the subject matter of the restitution sought. When the court denied this claim in ruling on the appellant's post-trial motions--the time at which the appellant first presented this argument--it relied upon the appellant's mischaracterization of the relief ordered: Restitution law is inapplicable, the court held, because its order granted specific performance rather than restitution. Joint Appendix at 495A. Concededly, this resolution of the claim may be unsatisfactorily semantic. A more compelling consideration, though, is Kama Rippa's collection to date of significant sums of money rewarding its efforts and expenditures in developing the compositions into valuable property.[7] Whatever the proper designation for the relief ordered, therefore, Kama Rippa's claim would not be recognized because it relies upon alleged facts lacking support in the record.
 
 
 15
 The appellant's second invocation of the equities is more generic but no more convincing. Kama Rippa is protected from forfeiture, it argues, by equity's strong distaste for imposing so harsh a remedy for breach. But while equity does traditionally disfavor forfeitures, it does not license judicial eradication of rights, such as Melanie's to secure a reversion, clearly vested by the contracting parties as part of their bargain. Cf., Kern River Co. v. United States, 257 U.S. 147, 155, 42 S.Ct. 60, 66 L.Ed. 175 (1921). In addition, since equity's distaste for forfeitures is almost certainly matched by its repugnance for petitioners beseeching its aid with 'unclean hands,' 2 J. Pomeroy, Equity Jurisprudence § 400 (5th ed. 1941), there should be little question that the plea to equity of a party which attaches its own indebtedness as a ploy to avoid its contractual duties will fall upon deaf ears.
 
 
 16
 The appellant's objections to the district court's judgment as equitably unsound are without merit. Since Kama Rippa's arguments that its late payment of royalties to Melanie was excused by her alleged breach of the Letter Agreement or by impossibility of performance also fail, we affirm the district court's summary judgment.
 
 
 17
 Affirmed.
 
 
 
 [1]
 The payment of royalties when due are of the essence. Accordingly, if Publisher fails to account and pay royalties in accordance with this Paragraph (Six of the Songwriter's Agreement, calling for payment at six-month intervals) and such failure and default continues following thirty (30) days written notice of such failure and default, this agreement shall terminate and all rights in and to the compositions theretofore covered shall revert to the Writer. This provision may be specifically enforced. However, notwithstanding anything to the contrary above, if performance of Publisher's obligation under this Agreement is delayed or becomes impossible or impractical by reason of any act of God, fire, earthquake, strike, labor disturbance, civil commotion, acts of government, its agencies or officers, any order, war (whether or not officially declared) regulation, ruling or action of any labor union or association of composers or employees affecting Publisher or the industry in which it is engaged or delays in the delivery of material and supplies, or for any similar or dissimilar reason Publisher may, upon notice to writers, suspends (sic) its obligations including its obligations to make payments hereunder for the duration of such delay, impossibility, impractability (sic), as the case may be
 Joint Appendix at 198A.
 
 
 [2]
 On a motion for an order of attachment the plaintiff shall show, by affidavit and such other written evidence as may be submitted, that there is a cause of action and the one or more grounds for attachment provided in section 6203 (sic 6201) that exist and the amount demanded from the defendant above all counterclaims known to the plaintiff
 
 
 [3]
 The state Supreme Court for New York County, Markowitz, J., vacated the attachment order because the sum attached ($75,000) fell short of Kama Rippa's acknowledged indebtedness to Melanie (approximately $80,000). Joint Appendix at 238--239A
 
 
 [4]
 Typical of the non sequiturs upon which Kama Rippa builds its arguments is its reliance here on cases affirming that documents 'that form part of a single transaction and are designed to effectuate the same purpose be read together,' Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2d Cir. 1965), for authority that the obligations established in the several documents are necessarily mutually dependent
 
 
 [5]
 The single incident of ambiguity noted by Kama Rippa is the language 'or dissimilar reasons' in the rider to paragraph six, see note 1 supra, at the end of the list of acts of nature and the like which would excuse untimely payment of royalties. To give effect to the spirit of the provision, the court, Joint Appendix at 423A n. 5, felt it necessary to disregard the phrase--a tack supported by New York contract law. First National Bank of East Islip v. National Surety Co., 228 N.Y. 469, 472--473, 127 N.E. 479 (1920); Potthoff v. Safety Armorite Conduit Co., 143 App.Div. 161, 163, 127 N.Y.S. 994, 995 (2d Dept. 1911); Auerbach v. Mr. & Mrs. Foster's Place, 128 Misc. 875, 220 N.Y.S. 281, 285 (Manhattan Mun.Ct., 4th Dist. 1927). See generally, 3 S. Williston, Contracts § 619, at 1782--1784 (rev. ed. 1936 S. Williston & G. Thompson eds.). Alternatively, the court might have assimilated the clause to the remainder of the provision by invoking ejusdem generis and, hence, construing this final and most generic term in a series in light of the more specific terms preceding it. Cf. Bers v. Erie R.R., 225 N.Y. 543, 546, 122 N.E. 456 (1919). The result under this latter analysis would duplicate the court's--a further confirmation of the validity of the court's construction
 
 
 [6]
 The ostensibly lawful purpose of the self-imposed attachment would appear to be to facilitate acquiring jurisdiction. Cf., McLaughlin, Supplementary Practice Commentary, N.Y.Civ.Prac. § 6201 (McKinney Supp. 1974--75)
 
 
 [7]
 Thus, the parties' Co-Publishing Agreement executed at the time of the Songwriter's Agreement to detail the financial aspects of the relationship, established, Supplemental Appendix of Appellee at 3a:
 
 
 [5]
 Publisher agrees to and shall pay to the Participant, after recoupment of all advances made by Publisher to Participant hereunder, fifty (50%) percent of the net income actually received and derived from the musical composition from the aforementioned territory, except as herein otherwise specifically provided. Net income for the purposes of this Agreement shall be gross receipts less:
 (A) Royalties and other sums payable to the authors and/or composers of the musical compositions, and/or other parties, if any, which are to be paid by Publisher directly to such authors and/or composers.
 (B) Specific mutually agreed upon exploitation expenses.
 (C) Costs of printing, engraving, arranging and editing printed editions of the musical compositions.
 (D) The costs of making demonstration records, however said costs shall not exceed One Hundred Twenty Five ($125) Dollars per musical composition for which a demonstration record is made.
 (E) Ten (10%) percent of the gross receipts derived from the musical compositions to cover Publisher's administrative charge for such items as bookkeeping, handling and other general administrative costs, including the cost of lead sheets and copyright registration fees.
 (F) The costs of the foreign collection or other fees actually charged by a collection agent who renders services with respect to the musical compositions subject hereto (provided that such collection fees shall not be in excess of those customarily imposed on music publishers throughout the industry) and any charges of any sales agents employed to sell any printed editions made of a composition subject hereto.