The BANK OF CANTON, LTD.,
Plaintiff,

v.

REPUBLIC NATIONAL BANK OF NEW
YORK, Defendant and
Third-Party Plaintiff,

v.

SHARP INTERNATIONAL CORP.,
Third-Party Defendant.

No. 78 Civ. 5520–CSH.

United States District Court,
S. D. New York.

July 9, 1980.

Kelley, Drye & Warren, New York City, for plaintiff; Richard J. Concannon, Charles E. McTiernan, Jr., Elizabeth M. O'Neill, New York City, of counsel.

Herman E. Cooper, P. C., New York City, for defendant and third party plaintiff; Herman E. Cooper, Jonathan L. Sulds, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff, The Bank of Canton, Ltd., ("BC") brought this action against defendant Republic National Bank of New York ("RNB") to recover damages resulting from RNB's dishonoring of drafts presented upon a letter of credit issued by RNB, which BC had negotiated. RNB filed a third-party complaint against Sharp International Corp. ("Sharp"), the customer at whose request RNB issued the letter of credit. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332(a), and also upon 12 U.S.C. § 632, defendant RNB being a national bank and the underlying transaction involving an international banking. The case is before the Court on cross-motions of BC and RNB for summary judgment pursuant to Rule 56, F.R.Civ.P. For the reasons stated, BC's motion is granted and that of RNB denied.

I.

The following undisputed facts appear from the affidavits and exhibits submitted on the motions.

Under date of January 31, 1977, RNB issued its irrevocable letter of credit No. A–38410, in the amount of $100,080. The beneficiary was EACA International Ltd. of Hong Kong. The letter covered "5,004 pcs. EP.800 TV GAME at U.S. $20.00 each, FOB HONG KONG, including 1% spare parts, free of charge." The letter specified that the covered goods would be shipped from Hong Kong to New York. The letter provided: "partial shipments are permitted." The credit was made "subject to the Uniform Customs and Practice for Documentary Credits (1974 revision), International Chamber of Commerce Publication No. 290" (hereinafter "UCP"). RNB provided in its letter of credit as follows:

"We hereby agree with the drawers, endorsers and bonafide holders of drafts drawn under and in compliance with the terms of this credit that such drafts will be duly honored on due presentation to the drawees if negotiated on or before the expiration date or presented to the drawees together with this letter of credit on or before that date."

The expiry date was April 10, 1977. The documents to accompany drafts upon the letter of credit were specified as follows:

"—Commercial invoice in quintuplicate.

—Special customs invoice in quadruplicate.

—Packing list.

—FCC Certificate.

—Full set, plus 2 non-negotiable copies of clean 'onboard' ocean bills of lading, issued to order of Republic National Bank of New York, N. Y., (L/C A–38410), marked: 'Notify: Sharp International Corp., 60 West 45th Street, New York, N. Y., 10036' and 'Freight Collect', evidencing shipment in containers only, not later than March 28, 1977."

RNB issued this letter of credit at the request of its customer, Sharp. Sharp had entered into a contract to purchase 5,004 electronic television games from EACA International Ltd. ("EACA"), an exporter in Hong Kong. The games contracted for were to bear Model No. EP800, a number also set forth in the letter of credit. One of the documents required by the letter of credit was an "FCC Certificate." This requirement reflected the fact that the Federal Communications Commission regulates the marketing of all radio frequency devices in the United States. Electronic TV games are included among such devices. An application for FCC approval must be accompanied by a technical description of the proposed equipment; a sample or prototype for the FCC to examine; and a form of identification plate to be affixed to the equipment, listing the name of the applicant and the model number of the equipment (in this case EP800). Application for FCC approval can only be made by the company whose name is to be placed on the equipment. While the applicant, in whose name the certificate is issued, may or may not be the manufacturer, the certificate is relied upon by those marketing the equipment at different levels of distribution. See 47 C.F.R. §§ 2.961 et seq.

When it acts favorably upon an application in respect of such equipment, the FCC grants what is known as "type approval." The electronic TV game involved in this case, Model No. EP800, received FCC "type approval" in a letter dated September 17, 1976, addressed by John T. Robinson, Chief, Equipment Authorization Branch, Laboratory Division of the FCC, to E & P Electronic (HK) Ltd. of Hong Kong, attention Paul Yang. The FCC letter of September 17, 1976 reflects that E & P Electronic (HK) Ltd. (hereinafter "E & P") had made application for type approval of the equipment on September 6, 1976. The full text of the FCC's letter of approval dated September 17, 1976 is set out in the margin.[1] The FCC printed the following instructions across the face of its letter of approval:

"ATTACH THIS GRANT OR COPY THEREOF TO YOUR CUSTOMS ENTRY FOR EACH SHIPMENT OF EACH TYPE NUMBER."

On February 28, 1977, EACA presented to BC for negotiation a draft in the amount of $60,000, drawn upon RNB, under the latter's letter of credit. The draft covered the shipment of 3,000 sets of EP800 TV games, and was accompanied by documents which BC examined against the requirements of the letter of credit. Concluding that the documents were in order, BC negotiated the draft, and, on March 2, 1977, mailed the draft and documents to RNB for payment.

The documents accompanying the $60,000 draft included a commercial invoice dated February 24, 1977, running from EACA as seller to Sharp as buyer. The invoice reflected a purchase order, dated January 31, 1977, of 5,004 EP800 TV games. Under "quantities," the invoice recited "this shipment 3,000," and "balance shipment 2,004."

1. "Pursuant to the reference application, type approval is hereby granted to you covering the equipment specified for operation under Part 15 of the Commission's Rules. The FCC Type Approval Number assigned to this equipment is TV–247.

"This grant of type approval is issued subject to payment of a fee of $25.00 on or before November 3, 1976, by check or money order made payable to Federal Communications Commission. Failure to make this payment by the required date shall result in this grant becoming null and void, and ineffective after that date.

"The attached duplicate copy of this letter should be enclosed with your remittance to ensure credit of payment to the proper application. It should be sent to the above address, but should not be directed to the attention of any individual."

The invoice further provided: "1 percent spare parts will be shipped with the last shipment."

The documents submitted with the $60,000 draft also included a partial copy of the FCC letter of grant dated September 17, 1976 (see fn. 2, *ante*). That document was xeroxed so as to reproduce only the FCC heading, the date, the addressee (E & P), the caption, the salutation, and the first of the three paragraphs of text. The second and third paragraphs, as well as the signature, were missing.

On March 11, 1977, EACA presented a second draft, in the amount of $40,080, to BC for negotiation. Again, after examining the accompanying documents within the context of the RNB letter of credit, BC negotiated the draft, and on March 11 airmailed the draft and documents to RNB for payment. The documents accompanying this second draft included a commercial invoice dated March 2, 1977 reflecting the total quantity ordered of 5,004 pieces, and shipment of the balance of 2,004 pieces, an amount also reflected in the customs invoice and ocean bill of lading. The commercial invoice recited: "One percent spare parts have been shipped with this shipment (free of charge)." A "spare parts list" accompanying the draft itemized the spare parts shipped. The quantity as to most items was 50 pieces. On four items, 100 pieces were shipped, and on one item 150 pieces were shipped. BC also forwarded, with this second draft in the amount of $40,080, a comparably truncated copy of the FCC certificate covering Model No. EP800 electronic TV games.

RNB received the $60,000 draft and accompanying documents from BC on March 8, 1977, and the $40,080 draft and accompanying documents on March 15. The first response BC received from RNB on either of these drafts was a cable sent by RNB on March 21 and received by BC on March 22. That cable referred to the $40,080 draft, which RNB said was "not acceptable to our customer due to unsigned copy of FCC certificate issued in the name of E & P Electronic." BC responded by airmailing to RNB, on March 24, a full copy of the FCC certificate, advising RNB in the forwarding letter and a cable of March 24, that E & P Electronic, the company named in the certificate, was the manufacturer of the shipped goods. RNB received the full text of the FCC certificate on March 31.

In a telex dispatched by RNB on March 30 and received by BC on March 31, RNB addressed the $60,000 draft, and stated that it was unable to effect payment "in view one percent spare parts not shipped and only copy of FCC Certificate received not signed and issued in name of E & P Electronic." BC responded by airmailing, on March 31, another full copy of the FCC certificate. BC also stated, in its reply telex, that one percent spare parts had been shipped with the shipment covered by the second of the two drafts, as indicated in the invoice accompanying that draft. BC further stated that partial shipments were permitted under the pertinent documents.

By further telex on April 1, BC contended that RNB's advice of purported discrepancies in the documents accompanying the $60,000 draft was not timely given under the UCP. No further communications were exchanged between the banks with respect to the $60,000 draft.

The second draft, in the amount of $40,080, generated some further telex exchanges. In a telex sent on March 31, RNB acknowledged receipt of the "corrected FCC form" enclosed with BC's letter of March 24, but stated that it was still unable to pay because the bills of lading were "stale." RNB relied in that connection upon Article 41 of the UCP. BC responded by telex of March 31, disputing that contention. By telex dated April 2, RNB reverted to the FCC certificate, stating that it must have "either an original duly signed certificate granted in name of beneficiaries of credit and not in name of E & P Electronic or a signed copy duly legalized by the U.S. Consul in Hong Kong." RNB further advised BC that it had been served with a show cause order in court proceedings initiated by Sharp, in which Sharp was apparently seeking an injunction against pay-

ment under the letter of credit. BC protested this most recent refusal to pay the $40,080 draft by telex dated April 4. That protest prompted a further telex from RNB dated April 6, in which RNB stated its understanding that "an FCC certificate must be an original document" issued by the agency, and not a copy; that the certificate issued to "someone other than the shippers" was not acceptable under UCP rules unless RNB's customer waived the discrepancy, which the customer (Sharp) declined to do; and that RNB had been advised by its attorneys that it was "obligated to withhold credit under the letter of credit based upon the court order . . ."

BC protested these further refusals to pay in a telex dated April 7. The letter of credit expired by its terms on April 10, 1977, without payment of either draft. This suit, in which BC seeks damages for RNB's failure to honor the two drafts, followed.

## II.

Certain principles of the law governing letters of credit are well established. A letter of credit constitutes the sole contract of the bank with the seller, *Venizelos S. A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir. 1970), or, as in the case at bar, the bank negotiating the letter at the seller's request. Banks issuing letters of credit "deal in documents and not in goods," *United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 259, 392 N.Y. S.2d 265, 270, 360 N.E.2d 943, 948 (1976). "Since the bank is interested only in the documents to be presented, the essential requirements of a letter of credit must be strictly complied with by the party entitled to draw against the letter of credit, which means that the papers, documents and shipping descriptions must be as stated in the letter." *Venizelos, supra*, at 465. "If the drafts, when presented, were accompanied by the proper documents, then [the issuing bank] was absolutely bound to make the payment under the letter of credit," whether or not it knew or had reason to believe that the *goods* did not conform to the un-

derlying contract of sale. *O'Meara Co. v. National Bank of N.Y.*, 239 N.Y. 386, 396, 146 N.E. 636 (1925). These general principles are subject to an exception that if fraud in the underlying contract of sale has been shown, the buyer may enjoin the issuing bank from paying drafts drawn by the seller under the letter of credit. Where, as here, the drafts are drawn by a negotiating bank, the latter may enforce them if it proves that it was a holder in due course, namely, that it took the drafts without notice of the fraud. *United Bank Ltd., supra*, at 41 N.Y.2d 262, 392 N.Y.S.2d 272, 360 N.E.2d. 950.

In the case at bar, RNB's first line of defense is asserted non-conformity of the documents accompanying the drafts. Three contentions are made: the FCC certificate was in the name of E & P, not EACA; the documents did not sufficiently recite the shipment of the 1% spare parts covered by the letter of credit; and the ocean bills of lading had become "stale." I consider these in order.

### The FCC Certificate

RNB's first comments on the form of the FCC certificates accompanying the drafts appeared in its March 21 telex declining to pay the $40,080 draft. The documents were not acceptable, RNB said, "due to unsigned copy of FCC certificate issued in the name of E & P Electronic." The same two objections were made in RNB's telex of March 30 about the $60,000 draft.

The first objection was well founded. The letter of credit called for an "FCC Certificate." An incomplete copy is not sufficient. This is as much a matter of common sense as law. Required documents must be presented in their entirety, showing, *inter alia*, the signature of an authorized official.

BC does not contend to the contrary. It remedied the defects by airmailing full copies of the FCC letter of grant, one for each draft. The evidence makes it clear that both certificates reached RNB before the April 11 expiry date on the letter of credit. Thus these defects may not be used to defeat BC's claim.

As to the second point, RNB contends that the FCC certificates are non-conforming because they are addressed to E & P, and not to EACA, the seller of the goods to Sharp and beneficiary under the letter of credit. RNB relies upon UCP, Article 7, which provides:

> "Banks must examine all documents with reasonable care to ascertain that they appear on their face to be in accordance with the terms and conditions of the credit. Documents which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in accordance with the terms and conditions of the credit."

Since all the other documents refer to EACA, the beneficiary, RNB argues that the reference to E & P in the FCC certificate creates a fatal inconsistency between the documents, thereby triggering Article 7.

The argument is entirely without merit. An Article 7 inconsistency between documents must appear "on their face." There is no requirement, either in the letter of credit or any of the documents submitted thereunder, that the FCC certificate be issued to the seller/beneficiary. Therefore no express inconsistency arises from the documents. The FCC certificate is inconsistent by implication only if there is a rational basis for inferring that an FCC certificate must be issued in the name of an exporter such as EACA. No such implication arises from the FCC regulations. They are intended, *inter alia*, to "promote efficient use of the radio spectrum" in the United States. 47 C.F.R. § 2.901(a). "Type approval" of the sort here presented "attaches to all units subsequently marketed by the grantee" which are identical with the model tested by the Commission. § 2.903(b). The application for approval may be filed by the manufacturer of the equipment, or by another, in which event "he shall attach a statement explaining the relationship between the applicant and the manufacturer accompanied by a confirming statement from the manufacturer." § 2.963(c). Type approval results in the affixing of a plate or label to each unit, which must contain, *inter alia*, the name of the grantee; the type number or model number followed by the number assigned to the equipment by the grantee; and the FCC type approval number. § 2.969. The equipment may then be sold to American consumers, and imported for that purpose if originating abroad. But there no requirement arises from the regulations that the *exporter* be the *grantee*. Why should there be? An FCC grantee, be he the manufacturer or a party in relationship with the manufacturer, may obviously be interested in selling to exporters in the country of manufacture. The regulations are intended to protect American consumers. They accomplish that purpose without it being necessary to impose the wholly artificial, and severely restrictive, requirement that only an FCC grantee may export the equipment to the United States.[2] But in the absence of such a requirement, it is commercial nonsense to say that the FCC certificate in the case at bar was facially inconsistent with the other commercial documents because it was issued to E & P as grantee, and not to EACA as seller/exporter.

I am mindful of the statement in the affidavit of Nessim Cohen, assistant vice president of RNB, that "uniform banking custom and practice requires the submission of an FCC certificate, in the name of the beneficiary, if a draft under the letter of credit is to be honored." ¶ 11. But the UCP contains no such provision, and these are the "uniform customs and practice" which govern the rights of the parties.[3]

---

**2.** Quite to the contrary, the FCC construes its approval as "running with the device," and not as a license issued to a particular individual. FCC approval, once issued, is used and relied upon by all others in the stream of commerce: exporters, importers, wholesalers, and retailers. Such post-grantee merchants are neither required nor eligible to obtain an FCC grant in their own names. See letter of Charles E. McTiernan, Jr., counsel for BC, dated June 22, 1979, to the FCC, and the agency's reply of July 3, Ex. A and B to McTiernan affidavit of July 6, 1979.

**3.** Compare Article 32(a), UCP, which provides that "[u]nless otherwise specified in the credit, commercial invoices must be made out in the

Assuming for these motions the existence of such a practice among New York banks—which seems highly doubtful, in view of the commercial considerations noted *ante*—it rises to no higher level than local custom or usage. As such, it is not binding on BC. RNB's letter of credit surely contemplated the possibility, if not likelihood, of negotiation in Hong Kong. In consequence, to the extent that local custom and usage may be considered at all in derogation of the UCP, it is the custom and usage at Hong Kong, not New York, which governs, *Pan-American Bank & Trust Co. v. National Bank*, 6 F.2d 762, 768 (2d Cir. 1925), as to which RNB offers no proof.[4] In short, the alleged custom can only be regarded as an attempted modification of the letter of credit, which called for an FCC certification covering electronic games bearing Model No. EP800. That is what BC furnished. The letter of credit cannot be altered by unwritten practices not referred to in the governing documents. Cf. *O'Meara Co. v. National Park Bank, supra*, 239 N.Y. at 398–9, 146 N.E. at 636. If Sharp as buyer wished to require that its seller be the FCC grantee, it should have so specified in the letter of credit.

The additional contention, faintly put forward by RNB in its telexes dishonoring the drafts, that the FCC certificate had to be an original FCC document and not a copy, flies in the face of the FCC document itself, which instructs the grantee to "attach this grant *or copy thereof* to your customs entry for each shipment of each type number" (emphasis added). RNB cites no authority for the proposition that the copy had to be "legalized" by a consular officer (whatever that may mean); and it would be bureaucratically cumbersome in the extreme to require consular officers all over the world to certify or attest to copies of FCC documents.

BC correctly relies upon Article 33, UCP, which provides:

"When other documents are required, such as Warehouse Receipts, Delivery Orders, Consular Invoices, Certificates of Origin, of Weight, of Quality or of Analysis etc. and when no further definition is given, banks will accept such documents as tendered."

The FCC certificates, as ultimately tendered in their complete form, conformed to the letter of credit, and form no basis for dishonor.

### The Spare Parts

■ RNB points out, correctly, that the letter of credit covered the shipment of 5,004 pieces of an electronic TV game, "including 1% spare parts, free of charge." RNB contends that the credit "required inclusion of the spare parts with each shipment." Main brief at 9. Because the documents accompanying the first shipment do not reflect the inclusion of any spare parts —indeed, BC concedes that no spare parts were included until the second shipment— RNB contends that it had no choice but to dishonor the $60,000 draft. Apparently, RNB does not rely upon this contention in resisting payment under the second draft; but the contention is without substance in any event.

Again, there is no basis for concluding that the documents failed to conform with the letter of credit. The letter specifically provided that "partial shipments are permitted." This echoes the provision in Article 35(a), UCP, that: "Partial shipments are allowed, unless the credit specifically states otherwise." In consequence, the seller complied with the letter of credit if it shipped, not later than March 28, 1977, in one shipment or more, a total of 5,004 games, together with 1% spare parts on that total quantity. The documents presented with the drafts established that it did so. Both bills of lading antedate March 28. The invoice submitted with the first shipment

---

name of the applicant for the credit." When the draftsmen of the UCP wished to provide with specificity for the identity of parties appearing in supporting documents, they knew how to do it.

4. The existence of such a custom or usage in Hong Kong is negated by the reply affidavit of Lam Chu Wah, BC's Branch Manager, at ¶ 3.

indicated that the spare parts would be included in the second shipment. The documents submitted with the second shipment indicated that the spare parts had, in fact, been included. The packing list accompanying the second draft, reflecting the shipment of a minimum of 50 units in respect of each spare part, demonstrated the supply of the entire amount called for; not even RNB contends that the total contractual amount of 5,004 games required EACA to ship 50.04 units of each spare part.

RNB's defense comes down, again, to an assertion in the affidavit of its vice president, Cohen, that "uniform banking custom and practice" requires that a letter of credit covering goods "including spare parts" requires that some spare parts be included in any partial shipment. ¶ 12. I reject that contention as insufficient in law, for reasons comparable to that underlying rejection of the "custom and practice" defense put forward in respect of the FCC certificate.

*The "Stale" Bill of Lading*

Article 41, UCP, provides:

"Notwithstanding the requirement of Article 37 that every credit must stipulate an expiry date for presentation of documents, credits must also stipulate a specified period of time after the date of issuance of the Bills of Lading or other shipping documents during which presentation of documents for payment, acceptance or negotiation must be made. If no such period of time is stipulated in the credit, banks will refuse documents presented to them later than 21 days after the date of issuance of the Bills of Lading or other shipping documents."

This article furnishes a defense in respect of the second draft, RNB contends, because the bill of lading for the second shipment was dated March 8, 1977; and the FCC certificate, in its complete form, did not reach RNB until March 31, 23 days later. RNB acknowledges the claim of BC to have received the document on March 24, but contends that a disputed issue of material fact, precluding summary judgment, exists as to whether or not BC actually did so.

■ This analysis, if sound, would apply to the first, $60,000 draft *a fortiori*, since the bill of lading on the initial shipment bore an earlier date, and BC did not airmail the complete FCC certificate in respect of that draft until March 31. However, in its barrage of telexes RNB made no mention of a stale bill of lading in respect of the first draft; and it is well settled that where communications dishonoring drafts do not refer to alleged defects, such defects are waived, and cannot be subsequently asserted. *O'Meara Co. v. National Park Bank, supra,* at 397, 146 N.E. 636.

■ There is no substance to RNB's contention regarding the second draft. Article 41, UCP, specifies a 21-day period "after the date of issuance of the Bills of Lading or other shipping documents" during which "presentation of documents for payment, acceptance or negotiation must be made." The bill of lading for the second shipment was dated March 8. In consequence, the complete FCC certificate had to be in BC's hands for "negotiation" not later than March 29. BC's letter forwarding the certificate by airmail to RNB is dated March 24. Apparently, RNB seeks to generate a triable issue of fact out of the date BC actually received the complete FCC certificate; but RNB concedes that it received the document by mail on March 31, and I am quite prepared to take judicial notice of the fact that an airmail letter mailed from Hong Kong on March 30 could not have reached New York on March 31. It follows that BC must have received the complete FCC certificate on or before March 29. There is no rational basis to doubt the assertion in the reply affidavit of Lam Chu Wah, BC's Hong Kong branch manager, that the full copy of the FCC certificate was presented by EACA as beneficiary to BC "on or before March 24, 1977." ¶ 6.

For the foregoing reasons, I reject the defense of RNB based upon asserted nonconformity of the documents accompanying the drafts.

### III.

As a second line of defense, RNB contends that the underlying transaction was

procured by fraud, and that BC has not sustained its burden of proving itself to be a holder in due course of the drafts.

██ As the party defending against the claim for wrongful dishonoring of drafts drawn under a letter of credit, RNB has the burden of establishing fraud in the underlying transaction. It is not until such fraud is established that the burden shifts to BC, as negotiating bank, to establish itself as a holder in due course. *United Bank Ltd., supra.* In the case at bar, RNB does not even allege fraud in the transaction in its answer. The answer consists of a general denial, and a single affirmative defense, based upon the restraining order issued by the New York State court, as to which see Point IV *post.* In consequence, RNB's pleading is deficient under Rule 8(c), F.R. Civ.P., which requires that fraud be set forth specifically as an affirmative defense, as well as Rule 9(b), which provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Even if these pleading deficiencies are disregarded, it is apparent that no triable issue of fact is raised with respect to underlying fraud. The allegations of fraud appear in two affidavits which Simon Unger, the president of Sharp, executed in support of Sharp's application to the State court for an order restraining RNB from paying out under the letter of credit. Unger stated that, on or about March 3, 1977, he received a telephone call from one Paul Yang, who stated that he was the principal stockholder of E & P Electronics (HK) Ltd.; that the equipment shipped to Sharp by EACA under the contract of sale was not manufactured by E & P; that the equipment was not made pursuant to the rules and regulations of the FCC; and that the FCC certificate covering the equipment was stolen from E & P and was being used by the seller, EACA. That affidavit was dated March 31, 1977. In a supplemental affidavit, dated April 13, Unger attached a copy of a letter dated April 6, 1977 from an FCC official, advising that the FCC had been notified by Yang that E & P, the manufacturer of the device in question, was no longer in business, and that the product being shipped under Model No. EP800 "differs substantially from that tested and approved by the Commission on September 17, 1976," resulting in its type approval certificate. The FCC, in its letter of April 6, 1977 to Unger, stated that it had initiated an investigation into the allegation, by requesting a sample of the device from current inventory and production, to test and compare with the unit already type approved. If that investigation confirmed the statements of Yang, the FCC letter continued, "serious consequences could result against E & P, the present marketing company, and any importer of this device." On the other hand, the FCC concluded:

> "If however, our investigation indicates that the product is in fact identical to that approved, including the required identification label, the matter will be considered closed until a further sample is taken of the product."

While the allegations in the Unger affidavits raise questions of possible fraud, the proof submitted on these motions demonstrates that the questions are without substance. Thus BC has submitted a letter dated June 27, 1977 from the FCC to Yang, then resident in Pasadena, California (Exhibit Z on plaintiff's motion for summary judgment). That letter, also signed by John T. Robinson, Chief of the FCC's Equipment Authorization Branch, reads in its entirety:

> "In re: Commission's request dated March 9, 1977, for sampling of E & P Electronics' Model EP888 Class I TV device
>
> "Gentlemen:
>
> "On June 16, 1977, the Commission examined and tested a Model EP800 Class I TV device (game) submitted in response to the above referenced request by the Commission. The results of this examination and testing assures us that the unit continues to be capable of complying with the technical specifications set forth in Part 15, Subpart H of the Commission's Rules.

"We, therefore, at this time, consider the matter closed until future samples may be requested. Type approval sampling is done on a regular basis from time to time. Your cooperation in the matter is appreciated."

Thus, whatever may have prompted Yang to raise questions with the FCC concerning the conformity of the Model EP800 devices being produced to the type approval, the fact of the matter is that the manufactured models conformed, and the FCC closed its investigative file.

With respect to Unger's allegation that EACA had stolen the FCC certificate, it was based upon a purported telephone conversation with Yang. Unger, of course, had no personal knowledge of these facts. BC submits, in reply, an affidavit of Eric Cheung, who states that he was a director and principal stockholder of E & P Electronics in March of 1977; that the FCC certificate covering the EP800 model TV games was neither stolen from E & P nor was it used by EACA without the knowledge and permission of E & P; and that the certificate in question "was being used by EACA in its transactions with Sharp and other United States importers with the full knowledge and permission of E & P." That affidavit, based upon personal knowledge, is entitled to controlling weight upon contested cross-motions for summary judgment under Rule 56.[5]

It follows that RNB has neither pleaded nor proved fraud in the transaction. In those circumstances, BC has no burden of proof to sustain with respect to its status, and the "fraud" defense to the action brought on the letter of credit fails.

### IV.

■ As a final line of defense, RNB argues that a State court injunction currently in effect forecloses BC from obtaining relief.

The action in question, commenced in the Supreme Court of the State of New York, New York County, is captioned *Sharp International Corp. v. Republic National Bank*, Index No. 6215/77. Sharp commenced the action on April 1, 1977 by order to show cause, on motion for a preliminary injunction with a temporary restraining order. The basis for the motion was Unger's affidavit, discussed under Point III, *ante.* The State court (Fein, J.) declined to issue a temporary restraining order barring RNB from honoring the letter of credit, and made the motion for a preliminary injunction returnable on April 15. Unger submitted a supplemental affidavit in favor of the injunction. Counsel for RNB appeared at the hearing on April 15, and advised that RNB did not oppose the motion. In consequence, on April 25 the motion for a preliminary injunction was granted "on consent," the order providing that during the pendency of the action RNB was enjoined and restrained from honoring and paying the letter of credit. Insofar as appears from the present record, no further litigation steps have been taken in the State court action.

In essence, RNB's defense is one of impossibility, arising out of the State court's restraining order. The defense is deficient in law. BC was not a party to the action commenced by Sharp against RNB, and therefore is not bound by an order entered into by Sharp and RNB on consent of the latter. That is the square holding of *General Aniline & Film Corp. v. Bayer Co.*, 305 N.Y. 479, 113 N.E.2d 844 (1953), in which the defendant entered into a consent decree under the federal antitrust laws, and then pleaded that decree in bar of plaintiff's suit for breach of contract. Judge Fuld wrote for the Court of Appeals:

"Whatever the rule might be if the plea were based upon a decree rendered in a contested action, the defense lacks validity where, as here, the judgment was en-

---

5. Affidavits submitted on motions for summary judgment are required to "set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Rule 56(e), F.R.Civ.P. Unger's account of what Yang told him, offered to prove the truth of the assertion, is inadmissible hearsay. Rules 801(c), 802, F.R.Evid.

tered upon defendant's consent." 305 N.Y. at 483, 113 N.E.2d 844.

The *General Aniline* court observed that the consent decree would not be usable or admissible against the consenting defendants in a suit brought by some third party; the converse situation was dealt with thus:

"Since, then, in such a situation, the decree could not be relied upon against the very parties who agreed to its entry, it would be almost unthinkable to allow them to invoke its provisions against a stranger." *Id.* at 484, 113 N.E.2d 844.

In *Lowenschuss v. Kane,* 520 F.2d 255, 265 (2d Cir. 1975), the Second Circuit stated generally:

"Impossibility caused by a judicial order prohibiting performance will excuse a party's performance only if the fault of the party owing performance did not contribute to the order."

In *Lowenschuss,* the preliminary injunction asserted as the basis for the impossibility defense was not consented to, but arose out of contested litigation. The *Lowenschuss* court held that the possible "fault of the party owing performance" posed issues of fact which precluded summary judgment. The case may be compared with *Kama Rippa Music, Inc. v. Schekeryk,* 510 F.2d 837 (2d Cir. 1975), in which the party asserting the defense of impossibility relied upon a court order which it obtained, attaching its own indebtedness to the plaintiff. Rejecting the defense of impossibility, the Second Circuit said:

"Since this court order, an attachment of Kama Rippa's indebtedness to Melanie, was procured by Kama Rippa itself, a defense of impossibility is as audacious as it is frivolous." 510 F.2d at 842.

In the case at bar, Sharp procured the injunction, but RNB did not contest it. Thus the case falls between the two situations presented by *Lowenschuss* and *Kama Rippa.* However, the consent to the injunction given by RNB brings the case at bar squarely within the *General Aniline* decision of the New York Court of Appeals, a holding to which the federal courts adhere, as appears from *United States v. Carrols Development Corp.,* 454 F.Supp. 1215, 1220 (N.D.N.Y.1978):

"Furthermore, by virtue of the fact that Carrols has voluntarily consented to the entry of the Proposed Judgment, it will not be able to rely upon the doctrine of impossibility of performance to avoid its obligations under the lease and covenant agreements. *General Aniline & Film Corp. v. Bayer Co.,* 305 N.Y. 479, 113 N.E.2d 844 (1953); *Lowenschuss v. Kane,* 520 F.2d 255, 265–67 (2d Cir. 1975); *Kama Rippa Music, Inc. v. Schekeryk,* 510 F.2d 837, 842–43 (2d Cir. 1975)."

Application of the *General Aniline* rule to cases involving letters of credit finds support in public policy. The world of commerce depends upon the viability of international letters of credit. There is a substantial risk that the system would be undermined, if issuing banks and their customers were permitted, by the initiation of friendly litigation and the entry of consent orders, to deprive irrevocable letters of credit of their commercial effectiveness and dependability.

I conclude, therefore, that the injunction in the State court proceeding does not bar BC's action for damages arising out of RNB's wrongful failure to pay under the letter of credit. In reaching that conclusion, I do not rely upon the fact that the State court's order was not entered until April 25, 1977, after the letter of credit had expired on its own terms, but upon the general principles of law above stated. BC is entitled to judgment from this Court at this time; nor do I perceive, in the State court injunction, any impediment to the process of this Court in enforcing the judgment, should that prove necessary. That is because, as to BC, the injunction is a nullity.

I have considered the other contentions put forward by RNB, and find them equally without merit.

## CONCLUSION

There are no triable issues of material facts. Plaintiff Bank of Canton is entitled

to summary judgment against defendant Republic National Bank of New York.

It appears from the motion papers that third-party defendant Sharp International Corp. concedes its liability to indemnify Republic National Bank, if the latter is held liable on the letter of credit to the Bank of Canton.

In these circumstances, the parties are directed to settle appropriate judgments on five (5) days' notice, in respect of both the complaint and the third-party complaint.

It is so ordered.