USA NETWORK, Plaintiff,

v.

JONES INTERCABLE, INC., and Jones
Spacelink, Ltd., Defendants.

No. 88 Civ. 6895 (KC).

United States District Court,
S.D. New York.

Jan. 18, 1990.

Richard J. Davis, Joseph G. Fortner, Jr. and William J. Ferrall, Weil, Gotshal & Manges, New York City, for plaintiff.

John S. Martin and Howard O. Godnick, Schulte, Roth & Zabel, New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge:

### BACKGROUND.

Plaintiff USA Network ("USA") commenced this action against Jones Intercable, Inc. ("Jones") on September 29, 1988, by filing a contemporaneous motion for an order temporarily restraining and ultimately enjoining Jones from terminating its contract, the "Affiliation Agreement,"[1] with USA pending the outcome of the action. We denied USA's request for a temporary restraining order. After further submission of memoranda and affidavits, we conducted a preliminary injunction hearing on November 18, 1988, and issued an opinion and order on January 19, 1989, denying USA's motion for a preliminary injunction. *USA Network v. Jones Intercable, Inc.*, 704 F.Supp. 488 (S.D.N.Y.1989). This prior opinion, familiarity with which is presumed, sets forth fully the background of this case.

Following our denial of USA's motion for a preliminary injunction, the parties conducted extensive discovery. On May 1, 1989, USA sought leave to serve and file a Second Amended Complaint (a) specifying certain additional categories of damages; (b) adding new claims for relief premised upon common law fraud, violation of 18 U.S.C. § 1961, *et seq.* ("RICO"), and tortious interference with contract; and (c) adding Jones Spacelink, Inc. ("Spacelink") as a defendant. Jones simultaneously opposed the motion for leave to amend and moved for summary judgment on the question of liability in the breach of contract claims in the First Amended Complaint and in Jones' Second Counterclaim, that USA

---

**1.** Designated Exhibits in Support of Motion by USA Network for Partial Summary Judgment and in Further Support of Leave to Amend ("USA Exhibits"), Ex. 1.

breached Paragraph 16 of the Affiliation Agreement by communicating with municipalities within Jones' service areas. USA cross-moved for summary judgment on the issue of liability in its breach of contract, contractual indemnification, and tortious interference claims, and on Jones' counterclaim. On October 10, 1989, we held oral argument on these motions.

For the reasons given below, we grant USA's motion for leave to amend the complaint, and treat Jones' opposition to that motion as a motion to dismiss, for failure to state a claim upon which relief can be granted, Counts Four (Common Law Fraud), Five (RICO), and Six (Tortious Interference with Contract) of the Second Amended Complaint. We deny Jones' motion to dismiss Counts Four and Six, but grant it with respect to the RICO claim, Count Five. On the cross-motions for summary judgment, we grant USA's motion in part and deny it in part, and Jones' motion for summary judgment is on the whole denied.

## DISCUSSION

### I. BREACH OF CONTRACT CLAIMS

Both parties have moved for summary judgment on their respective breach of contract claims.[2] Summary judgment may be granted only when the moving party can establish, based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must first look to the substantive law of the case to determine which facts are material. Only disputes over material facts will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing that no genu-

ine dispute as to material facts exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party to show that a genuine issue of fact exists. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Ultimately, "[i]n considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–511, 91 L.Ed.2d 202 (1986)), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

USA alleges that Jones breached its contract with USA by terminating USA from two-thirds of its systems on October 3, 1988, and from the remainder of its systems by the beginning of 1989. Whether Jones breached the contract by cancelling USA from cable systems constituting two-thirds (65%) of Jones' subscribers on October 3, 1988, the first day of the fall television season, depends on the meaning of the letter amendment to the Affiliation Agreement, dated September 1, 1986 ("Side Letter"),[3] which was signed contemporaneously with the Affiliation Agreement.

The question of interpretation is one of law to be answered by the court, and summary judgment is appropriate " '[w]here the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985)); *see United States v. 0.35 of an Acre of Land, More or Less, Situated in Westchester County, State of New York*, 706 F.Supp. 1064, 1070 (S.D.N.Y.1988); *West, Weir & Bartel, Inc.*

---

**2.** On these summary judgment motions, we consider only the question of liability, not damages or injunctive relief. Accordingly, we do not consider whether or not USA is entitled to a permanent injunction.

**3.** USA Exhibits, Ex. 2.

*v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709, 711 (1969); 3 A. Corbin, *Corbin on Contracts* § 554, at 222 (1960).[4] The determination of whether a contract or contract term is ambiguous is a threshold question of law for the court. *See Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir.1980); *0.35 of an Acre of Land*, 706 F.Supp. at 1070. "It is axiomatic that if the language of an agreement is explicit and unambiguous the courts must give it its plain meaning." *0.35 of an Acre of Land*, 706 F.Supp. at 1071 (citing *Omaha Indem. Co. v. Johnson & Towers, Inc.*, 599 F.Supp. 215, 218 (E.D. N.Y.1984)). "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d at 1277 (quoting *Breed v. Insurance Company of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d at 1277. "[O]ur goal must be to accord the words of the contract their 'fair and reasonable meaning.'" *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 555, 450 N.Y. S.2d 460, 463, 435 N.E.2d 1075, 1078 (1982) (quoting *Heller v. Pope*, 250 N.Y. 132, 135, 164 N.E. 881 (1928)).

■ Turning to the present case, the first question to be determined is whether the meaning of the Side Letter, i.e., its effect on the Affiliation Agreement, is ambiguous. We must determine "whether the agreement is so beset by ambiguity that the determination of the intent of the parties requires a trial at which a jury or other fact finder could clear up the ambiguity by passing on the credibility of the extrinsic evidence and whatever inferences reasonably could be drawn therefrom." *0.35 of an Acre of Land*, 706 F.Supp. at 1071. Applying the foregoing principles, we find as a matter of law that the Side Letter is unambiguous in its effect on Paragraph 4(d) of the Affiliation Agreement: the Side Letter does not alter Jones' obligation, outlined in Paragraph 4(d), to provide the USA Network to at least 75% of its aggregate subscribers.

Paragraph 1 of the Side Letter provides: With respect to subscribers receiving the USA program service as either a basic or tiered cable service in [Jones'] CATV [Cable Television] Systems ... [Jones] shall make payments to USA in accordance with the USA Network Basic Service Schedule ... then in effect. Such rate is contingent upon the delivery of the USA program service as a basic cable service[5] to at least 75 percent of the total number of subscribers to those CATV Systems owned or controlled by [Jones] as of September 1, 1986. In the event that [Jones] fails at any time during the term hereof to deliver the USA program service as a basic cable service to at least 75 percent of such total number of subscribers, [Jones] shall thereafter make payments to USA, with respect to its tiered USA subscribers only, in accordance with the

---

**4.** The parties agree that New York law is applicable to the substantive issues raised in the motions. Paragraph 12 of the Affiliation Agreement provides that the Agreement "shall be governed by and construed in accordance with the laws of the State of New York."

**5.** We note that, although the difference between basic and tiered service in the cable industry is usually thought to depend on whether the service is carried on one of the channels between 2 and 13 on the television set, or sometimes whether the service is provided as part of a basic package of channels supplied to a subscriber rather than as part of a group of services for which there is an additional charge, the Affiliation Agreement between USA and Jones ignores these distinctions and specifically defines basic and tiered services strictly in terms of the percentage of subscribers within any CATV system which receives USA Network. Thus, if more than 80% of the subscribers within a particular CATV System receive the USA Network, that system is a basic system. If the percentage is 80% or less, the system is tiered. Affiliation Agreement ¶ 1(a).

USA Network Tiered Service Schedule ... then in effect.

USA argues that this Side Letter deals only with when Jones had to pay the higher tier rate, as opposed to the basic rate, and not with market penetration, or the percentage of Jones' aggregate subscribers who, under the Affiliation Agreement, were to receive USA Network programming.

We agree. We conclude, as we have before, *USA Network v. Jones Intercable*, 704 F.Supp. at 489–90, that the Side Letter only deals with the circumstances in which Jones would have to pay USA according to the higher tier rate. Thus, if Jones provided USA as a basic service to at least 75% of its aggregate subscribers, then it would pay USA according to the basic rate for all of its subscribers. On the other hand, if Jones provided USA as a basic service to less than 75% of its aggregate subscribers, then it would pay USA according to the tier rate for its tiered subscribers. In other words, Paragraph 1 of the Side Letter provides an incentive, based on a fee reduction, for Jones to carry USA as a basic service to at least 75% of its total subscribers.

Jones contends that the Side Letter deals with both rates and market penetration, so that the Side Letter altered Jones' obligation, outlined in Paragraph 4(d) of the Affiliation Agreement, to "distribute the USA Network Service to at least seventy-five percent of the aggregate number of subscribers ... to its systems." Paragraph 1 of the Side Letter, however, does not contemplate Jones' cancelling USA from more than 75% of its *total* subscribers, whether basic or tiered; rather, it considers Jones' providing USA *as a basic service* to less than 75% of its subscribers,

in exchange for paying the tiered rate for its tiered subscribers.

■ Thus, Jones did not have the option, as Jones now claims, of cancelling USA from more than 25% of all of its subscribers, in exchange for paying higher fees. Such an interpretation of the contract would lead to the absurd result that Jones could reduce its carriage of the USA Network to only 1% of its aggregate subscribers (or even cancel USA altogether, in effect terminating the contract), as long as Jones paid USA at the tiered rate for those subscribers still receiving USA programming. We decline to reach such a result, which is clearly contrary to the plain and unambiguous language of the Affiliation Agreement and Paragraph 1 of the Side Letter, which only gave Jones the right to provide USA as a basic service to less than 75% of its aggregate subscribers, and pay the higher tier rates as a result. Accordingly, Jones breached its contract with USA when it cancelled USA from two-thirds of its subscribers on October 3, 1988.

A more difficult question is presented by USA's claim that Jones breached the Affiliation Agreement by terminating USA from the rest of its systems by January 1, 1989. As we explained in our earlier decision, USA informed Jones on June 28, 1988, that its rates would be increased by $.05 as of January 1, 1989, and by an additional $.05 as of January 1, 1990.[6] By letter *backdated* (on the letter itself and on the postage meter) to August 1, 1988, but actually drafted August 9 (see USA Exhibits, Exs. 6 and 8), mailed on August 10, and received by USA on August 16, Jones informed USA of its desire to terminate the Affiliation Agreement as of January 1,

---

**6.** As we noted in our earlier opinion, it appears that the second rate increase, if implemented, would violate the rate cap set forth in the Side Letter. *USA Network v. Jones Intercable*, 704 F.Supp. at 490. This second rate increase, we continue to believe, was not an unequivocal repudiation by USA of the contract; moreover, it was effectively retracted weeks before Jones supposedly acted on it.

We also decline to accept Jones' argument that USA's retraction was in effect a second notice of a proposed rate change, giving Jones another chance to accept or reject this change within 30 days. As USA convincingly argues, Jones' theory is inconsistent with the entire structure of the contract, is wrong as a matter of law, and has no factual support in the record. Memorandum of Law in Support of Motion by USA Network for Partial Summary Judgment

1989.[7] Pursuant to Paragraph 6(d) of that Agreement, however, Jones only had thirty days, from USA's notice of a rate increase, to notify USA that it regarded the rate increase as unacceptable, and that it intended to terminate the agreement.

Paragraph 6(d) of the Affiliation Agreement sets forth the mechanism for increasing rates, subject to Jones' right to terminate if dissatisfied with the increase. Paragraph 6(d) provides:

> On three (3) months' advance written notice, USA may change the rates, if any, set forth on the Basic Service Schedule or Tiered Service Schedule, as the case may be. If such change increases the rate payable by Affiliate [Jones] with respect to subscribers in a CATV System, then Affiliate may notify USA, within thirty (30) days of the giving of such notice, that Affiliate regards such change as unacceptable and wishes to terminate this Agreement solely with respect to any CATV System as to which such increase is applicable. In the event that Affiliate so notifies USA that such change is unacceptable under the provisions of this Section 6(d), this Agreement shall terminate on the date such proposed change becomes effective, unless within thirty (30) days of receiving Affiliate's notice, USA notifies Affiliate that USA has decided not to make such proposed change.

Paragraph 9 prescribes the manner in which notices under the Affiliation Agreement are to be given:

> *Notices:* Except as set forth below, all notices hereunder shall be in writing and delivered by hand or sent by certified mail return receipt requested, telegram or private wire to the receiving party at its address set forth above.... Notice given by mail shall be considered to have been given five (5) days after the date of mailing....

and in Further Support of Leave to Amend ("USA Mem.") at 41–42.

7. The circumstances surrounding the backdating of the letter, which form the core of USA's

In light of these provisions, there is no dispute that Jones' notice of termination was roughly twelve days late.

Whether or not Jones' late notice of termination was nevertheless effective depends on whether time was of the essence in the notice of termination provision in Paragraph 6(d) of the Agreement. If time was of the essence, then Jones' notice of termination would have been too late, and Jones would not have been able to terminate the contract on January 1, 1989. If on the other hand, time was not of the essence, then Jones' notice of termination, though late, may still have been effective.

As a general rule, time is not of the essence in a contract unless the contract so states. Calamari & Perillo, *Contracts* § 11–18 at 461 (3d ed. 1987). Generally and under New York law, however, time is of the essence in the exercise of an option. *See* 1A A. Corbin, *Corbin on Contracts* § 273 (1960); 1 S. Williston, *Williston on Contracts* § 87 (3d ed. 1957); *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392, 396–97, 397 N.Y.S.2d 958, 960, 366 N.E.2d 1313, 1316 (1977) ("It is a settled principle of law that a notice exercising an option is ineffective if it is not given within the time specified....") (citing Williston).

An "option" is an irrevocable offer for a specified period of time, which if accepted in accordance with its terms will either give rise to a contract, *1020 Park Ave., Inc. v. Raynor*, 97 Misc.2d 288, 289, 411 N.Y.S.2d 172, 173 (Civ.Ct.N.Y.C'ty 1978); *see also Heller v. Pope*, 250 N.Y. 132, 135, 164 N.E. 881, 882 (1928); or, in the case of a termination option, a rescission, *see T.I.P. Holding No. 2 Corp. v. Wicks*, 63 A.D.2d 263, 270, 407 N.Y.S.2d 709, 713 (2d Dep't 1978). "Time is likewise of the essence of options to terminate or cancel an existing contract...." 6 S. Williston, *Williston on Contracts* § 853 at 222 (3d ed. 1957); 1A A. Corbin, *Corbin on Contracts* § 273 at 593, n. 34.5 (1960).

common law fraud and RICO claims, will be discussed below. See *infra* at 313–14 (fraud), 316–17 (RICO).

■ USA's formal notice of a rate increase gave its affiliates, including Jones, the option to accept the rate increase, thereby creating a new contract, or reject the rate increase, thereby rescinding the contract, unless USA withdrew its rate increase within thirty days of Jones' rejection. Accordingly, Jones had the option to terminate the Affiliation Agreement, provided it gave USA notice of such termination within thirty days of USA's notice of a rate increase. Because time is of the essence in the exercise of an option, Jones' failure to exercise the option within thirty days made Jones' notice of termination ineffective, as a matter of law, to rescind the contract. *See, e.g., J.N.A. Realty Corp.,* 42 N.Y.2d at 397, 397 N.Y.S.2d at 960, 366 N.E.2d at 1315 (tenant had no legal right to exercise option to renew lease after option had expired); *Jessar Realty Corp. v. Louis Friedman Realty Co.,* 253 N.Y. 298, 299, 171 N.E. 62 (1930) (buyer lost right to cancel contract by sending notice of cancellation one day late); *T.I.P. Holding No. 2 Corp.,* 63 A.D.2d at 271, 407 N.Y.S.2d at 714 (by failing to pay installment on day it came due, real estate developer lost option to purchase land).

■ We recognize that the mechanism in Paragraph 6(d) of the Affiliation Agreement for proposing, and accepting or rejecting, a rate increase is not an option in the usual sense of, for example, an option to purchase real estate or stock by a particular date, which expires on that date. Even if we were to conclude, however, that Jones did not have an option in the strict legal sense of that term, the structure of Paragraph 6(d) would lead us to conclude that time was of the essence in that paragraph's rate increase and termination provisions. Jones had the power to "lock in" its right to terminate the Affiliation Agreement by rejecting the rate increase within thirty days, a power which, by the express language of the Agreement, expired thirty days after the notice of rate increase. Given the significant consequences of Jones' acting within thirty days, or failing to act within that time, we find that time was of the essence in the rate increase and termination provisions of the Affiliation Agreement.

Because we conclude as a matter of law that time was unambiguously of the essence in the provisions of Paragraph 6(d), we need not look outside the four corners of the Affiliation Agreement, at the conduct of the parties, to interpret that provision of the contract. We do note, however, that Jones' own undisputed conduct in backdating the letter is convincing proof that Jones understood time to be of the essence in Paragraph 6(d). *See Viacom International, Inc. v. Lorimar Productions, Inc.,* 486 F.Supp. 95, 98 n. 3 (S.D.N.Y.1980) ("The practical interpretation of a contract by the parties, manifested by their conduct subsequent to its formation of any considerable length of time before it becomes a subject of controversy, is entitled to great, if not controlling weight in the construction of the contract."). Indeed, USA argues that, because of Jones' deceptive scheme in backdating the letter, and its subsequent misrepresentations to the Court about those efforts, the termination letter should be treated as a nullity, and judgment should be entered for USA on its breach of contract claims. *See Eppes v. Snowden,* 656 F.Supp. 1267 (E.D.Ky.1986); *Carlucci v. Piper Aircraft,* 102 F.R.D. 472 (S.D.Fla.1984). Although we decline to take this extreme step, we are unwilling, in light of Jones' conduct, to excuse Jones' late notice of termination on equitable grounds.

■ Jones argues that its notice of termination should be considered effective because USA suffered no prejudice from the delay in receiving it. New York courts are sometimes willing to excuse the failure to give timely notice "assuming it would not prejudice the innocent party, where the failure was the result of negligence or inadvertence, ... but such relief is available only where there would otherwise be a forfeiture." *Record Club of America, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1272 (2d Cir.1989) (citing *J.N.A. Realty Corp. v. Cross Bay Chelsea,* 42 N.Y.2d at 397, 397 N.Y.S.2d at 960, 366 N.E.2d at 1315). Since Jones did not suffer any for-

feiture because of its failure to exercise its option in a timely manner, we reject Jones' argument that we should excuse its late notice of termination on equitable grounds. In addition, Jones' lack of clean hands precludes equitable relief. *See Kama Rippa Music, Inc. v. Schekeryk,* 510 F.2d 837, 844 (2d Cir.1975) ("[E]quity's distaste for forfeiture is almost certainly matched by its repugnance for petitioners seeking its aid with 'unclean hands'...."). Accordingly, Jones' termination notice was ineffective, and Jones breached the Affiliation Agreement by cancelling USA from the remainder of its subscribers on January 1, 1989.[8]

The third breach of contract claim we address is Jones' Second Counterclaim, that USA breached the Affiliation Agreement by communicating by wire, mail and in person with municipalities, in violation of Paragraph 16 of the Agreement. Paragraph 16 provides: "Any communication(s) between USA and any municipality within Affiliate's [Jones'] service areas shall require prior written approval by Affiliate, which approval shall not be unreasonably withheld."

It is not disputed that, after Jones' initial breach on October 3, 1988, USA contacted municipalities within Jones' service areas. For example, on November 16, 1988, both USA and Jones spoke at a hearing in Buffalo, Minnesota (where Jones had not cancelled USA on October 3, 1988) before the Sherburne/Wright County Cable Communications Commission, concerning Jones' proposed replacement of USA with Turner Network Television ("TNT") in that system. Designated Exhibits in Support of Jones Intercable, Inc.'s Memorandum of Law in Support of Cross Motion for Summary Judgment and in Opposition to Motion for Leave to Amend ("Jones Exhibits"), Ex. I. USA argues, however, that it was entitled to suspend performance of its Paragraph 16 duties until such time as Jones restored USA to at least 75% of its subscribers, and resumed its contractual obligations to market and promote USA.

■ A non-breaching party is entitled to suspend performance under a contract if the breach of the contract is "of so material and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties." *Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183, 1186 (2d Cir.1975). Jones' termination of USA from two-thirds of its subscribers on October 3, 1988, was clearly a material breach of its contract with USA. Therefore, USA was entitled to suspend performance under the Affiliation Agreement.

Jones contends, however, that because USA continued its performance under the Affiliation Agreement, in those service areas where Jones had not terminated USA, USA remained liable under the contract. Under New York law, the party against whom a breach is committed has a choice of either continuing the contract or terminating it. " 'If the party chooses to go on, he loses his right to terminate the contract because of the default.' " *Apex Pool Equipment Corp. v. Lee,* 419 F.2d 556, 562 (2d Cir.1969) (quoting *Emigrant Industrial Savings Bank v. Willow Builders, Inc.,* 290 N.Y. 133, 145, 48 N.E.2d 293, 299 (1943)). Thus, " 'the party who refuses to regard [the contract] as terminated by the breach remains liable to all his obligations and liabilities under it.' " *Specialties Development Corp. v. C–O–Two Fire Equipment Co.,* 207 F.2d 753, 756 (3d Cir.1953) (quoting *Rosenthal Paper Co. v. National Folding Box & Paper Co.,* 226 N.Y. 313, 324, 123 N.E. 766, 769 (1919)). USA, in other words, was not entitled both to continue benefitting from the contract and to repudiate the contract, thereby ending its

---

**8.** As we explained in Footnote 3, *supra,* we reject Jones' argument that USA's agreement on September 6, 1988, to abide by the rate cap for the January 1, 1990, rate increase was a second notice of rate change, and that Jones therefore, with its notice to USA on September 30, 1988, effectively terminated the contract at least as of January 1, 1990. Accordingly, Jones' breach of the contract extends from October 3, 1988, through December 31, 1990.

Although it would seem that, had Jones not breached, the basic service schedule rate for 1989 would be 16 cents, and for 1990, 17.6 cents, this question need not be decided until the trial on damages.

own obligations to perform under the contract.

■ We find, however, that in light of Jones' entire course of conduct in breaching the Affiliation Agreement, no reasonable jury could find that USA breached Paragraph 16 of the Agreement, by contacting municipalities *after* Jones' breach on October 3, 1988. Paragraph 16 must be read within the context of the contract as a whole, to give meaning to all its provisions. *See Mars Associates, Inc. v. Health & Mental Hygiene Facilities Improvement Corp.*, 47 A.D.2d 5, 6, 364 N.Y.S.2d 67, 69 (3d Dep't 1975), *aff'd*, 38 N.Y.2d 878, 382 N.Y.S.2d 744, 346 N.E.2d 545 (1976); *River View Assoc. v. Sheraton Corp. of America*, 33 A.D.2d 187, 190, 306 N.Y.S.2d 153, 156 (1st Dep't 1969), *aff'd*, 27 N.Y.2d 718, 314 N.Y.S.2d 181, 262 N.E.2d 416 (1970). So read, Paragraph 16 clearly and unambiguously contemplates commonality of interests between USA and Jones, so that Jones is entitled to represent both its own and USA's interests before municipalities, as the sole voice for both USA and Jones.

Yet, when USA contacted municipalities, after Jones' breach, the commonality of interests between USA and Jones no longer existed. At the time of the Minnesota hearings, for example, Jones had already impermissibly repudiated in substantial part the symbiotic relationship it had with USA. It had, behind USA's back, negotiated with USA's rival, TNT, and then supplanted the programming provided by its contract colleague, USA, with TNT, a move which was accompanied by a press conference on September 28, 1988, and a press release containing disparaging remarks about USA programming. USA Exhibits, Ex. 13. Jones' immediate and future intentions with respect to its rejected companion in commerce appeared to be anything but benign. Thus, USA was entitled, and no reasonable jury could find otherwise, to conclude that the intentions of Jones were hostile to USA's interests. As the record of the proceedings in Minnesota confirms, Jones indeed did carry the banner for programming other than that provided by USA. Jones Exhibits, Ex. I. To read the

Affiliation Agreement under such circumstances as requiring USA to forego a defense of its programming in the Minnesota cable marketplace, and elsewhere, would be inequitable and unjust, and no reasonable jury could find otherwise. Accordingly, USA is entitled to summary judgment on Jones' Second Counterclaim. *See Anderson v. Liberty Lobby*, 106 S.Ct. at 2511–12.

Finally, we address USA's claims 1) that Jones breached its "best efforts," promotion, and marketing obligations, pursuant to the Paragraphs 4(b) and 4(d) of the Affiliation Agreement, and 2) that Jones, because of its contractual breach, must indemnify USA for all damages resulting therefrom, pursuant to Paragraph 8(b) of the Affiliation Agreement. Neither of these claims is addressed or disputed by Jones. Accordingly, USA is entitled to summary judgment on these claims.

## II. TORTIOUS INTERFERENCE CLAIM

In its Second Amended Complaint, USA adds a claim that Jones caused the breach of the affiliation agreement between USA and Comtec Cable Television ("Comtec"), a USA affiliate whose agreement with USA was to have expired on November 7, 1989. On or about October 4, 1988, USA was advised by Comtec that Comtec was being acquired by Jones Spacelink, Inc. ("Spacelink"). Affidavit of David Lestch, sworn to June 12, 1989 ("Lestch Aff."), ¶ 4. In anticipation of that acquisition, and because Comtec's rights could be transferred only with USA's prior written consent, Lestch Aff., Ex. 1, ¶ 6(b)(i), Comtec wrote to USA asking that USA consent to the change in control. Lestch Aff., ¶ 5 and Ex. 2.

In response to Comtec's letter, USA told Comtec that USA would consent to the merger, "provided that USA receives, to its reasonable satisfaction, written assurances from Spacelink that Spacelink will (a) distribute the USA program service without interruption within Comtec's CATV systems up to and including the termination date of the Agreement and (b) fulfill each of Comtec's obligations set forth therein." Lestch Aff., Ex. 3 (letter, dated October 25,

1988, from David A. Lestch, Attorney for USA, to Michael S. Chagami, Treasurer of Comtec). Jones Spacelink was "of the opinion that the conditions demanded [in the letter] go beyond Comtec Inc's obligations set forth within [the] Affiliation Agreement, and are thus unacceptable." Lestch Aff., Ex. 4 (letter, dated November 30, 1988, from Ruth E. Warren, Vice–President—Operations for Jones Spacelink, to David A. Lestch). Assertedly because USA unreasonably withheld its consent to the transfer from Comtec to Spacelink, Spacelink terminated USA as of February 1, 1989. Memorandum in Support of Cross–Motion for Summary Judgment and in Opposition to Motion for Leave to Amend ("Jones Mem.") at 57.

According to USA, however, USA did not unreasonably withhold its consent. To the contrary, USA asserts that consent was granted, without any attempt to impose any new conditions on Comtec. Memorandum of Law in Support of Motion by USA Network for Partial Summary Judgment and in Further Support of Leave to Amend ("USA Mem.") at 51. USA points to David Lestch's letter, dated October 25, 1988 (Lestch Aff., Ex. 3), which, according to USA, merely asked Spacelink to reaffirm that it would meet Comtec's contractual obligations throughout the remainder of the term. Lestch Aff., ¶ 7. USA sought such assurances from Jones Spacelink because of Jones' breach of its Affiliation Agreement with USA on October 3, 1988. Lestch Aff., ¶ 6. Because it assertedly did not unreasonably withhold its consent, USA argues that Spacelink had no reason to terminate the affiliation agreement.

The October 25, 1988 letter, however, is ambiguous. If USA intended only that Spacelink reaffirm that it would "fulfill each of Comtec's obligations set forth" in the Comtec affiliation agreement, then only part (b) of the second paragraph of the letter need have been included in the letter. Yet, USA also included a part (a), which required Spacelink to "distribute the USA program service without interruption within Comtec's CATV systems up to and including the termination date of the Agreement." While this part of the letter could

be read as merely another request for a reaffirmation of the agreement, it could also be read, as Jones argues, as requiring that Spacelink waive its right, under Paragraph 6(d) of the Comtec affiliation agreement, to reject a USA rate increase and to terminate the Comtec Agreement. Jones Mem. at 57.

█ Thus, although USA has stated a claim for tortious interference with contract, *see, e.g., Nordic Bank PLC v. Trend Group, Ltd.,* 619 F.Supp. 542, 560–61 (S.D. N.Y.1985) (tortious interference claim demonstrated upon showing of existence of valid contract; defendant's knowledge of that contract; defendant's intentional procurement of breach of that contract; and damages caused by the breach), we cannot grant summary judgment on this claim. Accordingly, USA's motion for summary judgment on its tortious interference claim is denied.

## III.  COMMON LAW FRAUD CLAIM

In its Fourth Claim for Relief in the Second Amended Complaint, USA alleges that Jones defrauded USA by backdating the termination letter (USA Exhibits, Ex. 6), setting back the postage meter, informing USA by letter on September 9, 1988 that it was doing a survey of its systems, and repeatedly misrepresenting its intent to terminate USA and the timing of any termination. According to USA, these actions went beyond a mere fraudulent breach of the contract, for which no action lies under New York law, and beyond a mere failure to disclose business intentions during negotiations. USA contends further that it detrimentally relied on Jones' fraudulent actions, by devoting time and money to negotiations with Jones about maintaining its carriage of the USA Network, and to investigating whether Jones' termination letter was timely sent on August 1, 1988.

The circumstances surrounding the backdating of the letter and the postage meter do tend to reveal a fraudulent intent. On August 10, 1988, Jones mailed its termination letter to USA, but, in order to de-

ceive first USA and then the Court into believing that its option had been timely exercised, Jones a) deliberately backdated to August 1 all copies of the notice; b) turned back the postage meter to August 1 so that the postmark would falsely indicate that it was mailed on that date; c) submitted a false affidavit in connection with the hearing on the temporary restraining order and misled its trial counsel into unknowingly denying to the Court that the termination notice had been backdated; and d) misled its trial counsel into unknowingly representing to the Court at the preliminary injunction hearing, on November 18, 1988, that the postage meter had not been turned back. These events are set forth in detail, with references to exhibits, affidavits, and deposition testimony, in USA's memorandum of law in support of its motion for partial summary judgment (USA Mem.) at pages 13–16. In its Supplemental Memorandum of Law in Opposition to Motion for Preliminary Injunction, dated November 23, 1988, at the footnote on page 4, Jones finally admitted that "[w]e now suddenly remember that we also backdated the postage meter stamps."

USA also alleges that Jones' fraudulent conduct with respect to its negotiating position continued from the middle of August through the end of September, 1988, during which time Jones' assertedly misled USA into believing that Jones would not terminate USA until January 1, 1989, as the termination letter indicated, if it would terminate USA at all. For example, during a September 6, meeting between USA and Jones officials, Jones allegedly gave USA the false impression that it was still open to negotiations about its plans to terminate its carriage of USA on January 1, 1989. Deposition of Kay Koplovitz, President of USA, taken November 10, 1988 ("Koplovitz Dep.") at 47–50; Deposition of Douglas V. Holloway, taken October 27, 1988 ("Holloway Dep.") at 72–73. In addition, after their discussions, Jones informed USA by letter that "we have decided that a wider consultation on this issue with our field system and marketing managers is appropriate. The process has begun. I don't think we will have our thoughts together for 10–14 days." USA Exhibits, Ex. 16 (letter dated September 9, 1988, from Greg Liptak, President of Jones Intercable, to Kay Koplovitz, President and Chief Executive Officer of USA Cable Network).

At the same time, however, it appears that Jones was already making plans to terminate USA from its cable systems on October 3, 1988. For example, James Honiotes, Jones' Director of Programming, testified that at least by September 9, 1988, Jones had decided to switch from USA to TNT. Deposition of James Pete Honiotes, taken November 3, 1988 ("Honiotes Dep.") at 80. Thus, Jones mailed confidential instructions to the publisher of Jones' cable guide to revise the guide to reflect that switch. USA Exhibits, Ex. 15 (letter from Julie Sachs to Terry Evans, Cosmo Graphics). These instructions were apparently sent the same day that Jones representatives informed USA that Jones was going to survey its managers. Moreover, this survey was apparently conducted by Jones to ascertain whether practical considerations, such as advertising interconnects, local franchise requirements, or a competitive cable marketplace, dictated retention of USA. Deposition of Gregory J. Liptak, taken November 1, 1988 ("Liptak Dep.") at 26–29. Jones' survey did not assess system managers' feelings about the popularity of USA programming, as Jones had assertedly led USA to believe it would.

Jones attacks USA's fraud claim in three ways: 1) USA's claim is merely a claim for fraudulent breach of contract, for which no cause of action lies under New York law, *see, e.g., Metropolitan Transp. Auth. v. Triumph Advertising Prod., Inc.,* 116 A.D.2d 526, 497 N.Y.S.2d 673 (1st Dep't 1986); 2) Jones had no affirmative duty to disclose its business plans in the absence of any affirmative misrepresentations about those plans; and 3) USA did not detrimentally rely on Jones' allegedly fraudulent actions. USA's fraud claim withstands each of these attacks.

■ First, USA has alleged sufficient facts to show that Jones did more than fraudulently breach its contract with USA. The backdating of the termination letter

and the alleged subsequent misrepresentations support the inference that Jones was attempting to defraud USA by leading USA to believe that it would not be terminated, if at all, until January 1, 1989, while Jones knew that it would actually terminate the contract on October 3, 1988. USA may state a claim for fraud on these grounds. *See, e.g., Chase Manhattan Bank, N.A. v. Perla,* 65 A.D.2d 207, 411 N.Y.S.2d 66 (4th Dep't 1978) (cause of action for fraud requires proof of representation of fact which is false and known to be false when made, which is offered to deceive another and with intention to induce other to act or refrain from acting). According to USA, Jones' termination of USA from two-thirds of its subscribers on October 3, 1988, came as a complete surprise to USA, thereby preventing USA from taking measures to protect itself in the marketplace and reduce the damages from Jones' termination of the Affiliation Agreement. Because Jones' alleged fraud goes beyond its breach of the Affiliation Agreement, USA has stated a claim for fraud.

Second, USA has alleged sufficient facts to show that Jones did more than fail to disclose its business plans. Jones affirmatively represented, in the termination letter, that it would terminate USA as of January 1, 1989. USA Exhibits, Ex. 6. As discussed above, see *supra* at 314, at least by September 9, 1988, Jones had decided to switch from USA to TNT. Yet, Jones continued to negotiate with USA and give USA the firm impression that the termination date remained January 1, 1989. Although Jones had no duty, in the absence of an affirmative misrepresentation, or in the absence of an affirmative representation which was correct when made, but later became false, to disclose its business plans, *see SEC v. Great American Industries, Inc.,* 407 F.2d 453, 461 (2d Cir.1968), *cert. denied,* 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969); *Idrees v. American University of the Caribbean,* 546 F.Supp. 1342, 1349 (S.D.N.Y.1982), USA has sufficiently alleged that Jones did make affirmative misrepresentations, or at least representations which were correct when made, but later became false. These representations gave rise to a duty on Jones' part to correct the misimpressions it had created.

Third, USA has alleged sufficient facts to raise a genuine issue of material fact as to whether USA relied to its detriment on Jones' fraudulent conduct. Jones argues that because USA never regarded the termination letter as timely, it did not rely on Jones' fraudulent backdating scheme. As USA points out, however, even if USA believed the letter was late, it had to prepare, as a matter of prudence, for the possibility that Jones' termination letter would be considered timely in a court of law. USA Mem. at 66–67. Indeed, if USA had been absolutely convinced that Jones' termination notice was untimely, it need not have entered into negotiations at all; it could simply have sued Jones for breach of contract, if and when Jones terminated USA on January 1, 1989.

Jones also asserts that USA knew that Jones was going to drop USA on October 3, 1988. In support of this contention, Jones points to the deposition of Kay Koplovitz, who testified that sometime in mid-September, she learned that Jones was planning two program lineups for the fall television season—one with TNT replacing USA and another with USA alongside TNT. Koplovitz Dep. at 77–91. What Jones ignores, however, is that Koplovitz and others at USA, upon learning of the two program lineups, assumed that Jones was considering dropping its carriage of USA to 75%, the contractual minimum. USA did not anticipate that Jones would drop USA from two-thirds of its subscribers. Koplovitz Dep. at 90; Holloway Dep. at 94–95. Whether USA relied on Jones' alleged misrepresentations is thus clearly a factual matter.

With respect to whether USA relied to its detriment, USA alleges that it spent valuable time and money on futile negotiations with Jones, in reliance on Jones' alleged fraudulent acts. In addition, USA alleges that it was harmed by its inability to prepare for Jones' breach on October 3, 1988. With these allegations, USA has argued at least to the point of a jury question whether it relied to its detriment on Jones' al-

leged misrepresentations. Because USA has sufficiently alleged that Jones defrauded USA, and that USA detrimentally relied on Jones allegedly fraudulent actions, Jones' motion to dismiss USA's common law fraud claim in the Second Amended Complaint is denied.

## IV. RICO CLAIM

■ Finally, we turn to the RICO claim which constitutes USA's Fifth Claim for Relief in the Second Amended Complaint. USA alleges that, based upon a "pattern" of "racketeering activity," including mail and wire fraud and obstruction of justice, an "enterprise" consisting of Jones and others violated 18 U.S.C. § 1962(c), which makes it unlawful, in pertinent part,

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

Jones moves to dismiss USA's RICO claim primarily on the grounds that 1) USA lacks standing to assert a RICO cause of action; and 2) USA has failed to plead a pattern of predicate activity. The first ground seems to repeat Jones' arguments on detrimental reliance, which we rejected in our discussion of USA's common law fraud claim. See *supra* at 315–16. Because we agree with Jones that USA has failed to plead a pattern of predicate activity, however, we grant Jones' motion to dismiss USA's RICO claim.

To state a claim under RICO, a complaint must allege: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce. *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). A "pattern" under RICO "requires at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). In its most recent pronouncement on RICO's pattern requirement, the Supreme Court wrote:

> In our view, Congress had a more natural and common-sense approach to RICO's pattern element in mind, intending a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the continued likelihood of, continued criminal activity.

*H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, ——, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). Thus, to establish a pattern of racketeering activity, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at ——, 109 S.Ct. at 2900.

USA bases its RICO claim on a series of predicate acts committed by Jones, including: 1) sending, by use of the United States mails, in violation of 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), three copies of the termination letter, each of which bore the false date of August 1, 1988; 2) turning back the postage meter, from August 10 to August 1, 1988, for each of the three letters; 3) by letter of September 28, 1988, fraudulently representing to USA that the August 1, 1988 letter was timely and mailed on August 1, 1988; 4) on numerous occasions, during communications with USA by telephone wires, failing to correct the misrepresentations regarding the termination letter; 5) by letter of September 9, 1988, falsely representing to USA that it was conducting a survey of field managers; 6) on September 23, 1988, sending, to participants in the enterprise, a videotape regarding Jones' pending termination of USA as of October 3, 1988, while representing to USA that it would not be terminated until January 1, 1989; and 7) on at least two occasions, obstructing justice, in violation of 18 U.S.C. § 1503, by causing Jones' counsel to misrepresent to the Court that Jones had not backdated the letters or the postage meter, a misrepresentation that

was not fully corrected until November 23, 1989. Complaint, ¶ 52. We find that USA has more than adequately pleaded at least two predicate acts of mail and wire fraud and obstruction of justice. *See, e.g., United States v. Kaplan,* 886 F.2d 536 (2d Cir.1989) (bribes offered to two persons in a conversation with one of them stated two predicate acts) *petition for cert. filed,* 58 U.S.L.W. 3431 (U.S. December 13, 1989) (No. 89–1000); *United States v. Indelicato,* 865 F.2d 1370 (2d Cir.) (en banc) (nearly simultaneous shooting and killing of three persons constituted more than one predicate act), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

The predicate acts alleged by USA are also sufficiently related. Adopting a provision from the Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575, *et seq.,* the Supreme Court defined "relatedness" as " 'criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *H.J. Inc.,* —— U.S. at ——, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(d)). Thus, the necessary relationship between predicate acts may be established in a number of ways, including "temporal proximity, or common goals, or similarity of methods, or repetitions." *United States v. Indelicato,* 865 F.2d at 1382.

Jones' alleged predicate acts are clearly related. In fraudulently backdating the three termination letters and the postage meter stamps, Jones committed acts of mail fraud which not only were proximate temporally and identical in method but also served the specific common goal of deceiving USA into believing that the letters had been sent in a timely fashion. Jones' two alleged acts of obstruction of justice and certain of Jones' mail and wire fraud served this same goal. Furthermore, as USA alleges, all of Jones' acts of mail and wire fraud—which were assertedly committed in furtherance of Jones' scheme to deceive USA into believing that Jones would not terminate USA carriage before January 1, 1989 and that Jones was seriously negotiating with USA over rates—shared a common goal of lulling USA into inaction while Jones was preparing to oust USA in favor of its competitor, TNT.

No matter how interrelated Jones' alleged predicate acts may have been, however, USA simply has not established the necessary "threat of continuity" to satisfy the requirements of a "pattern" of racketeering activity. Recognizing the difficulty of defining the concept of "continuity," the Supreme Court, in *H.J. Inc.,* offered the following guidance:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. (Citation omitted.) It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.

*H.J. Inc.,* —— U.S. at ——, 109 S.Ct. at 2902. The threat of continuity may also be established "by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.*

"Whether the predicates proved establish a threat of continued racketeering activity depend upon the specific facts of each case." *Id.* In *H.J. Inc.* itself, the Supreme Court determined that the allegations of racketeering predicates occurring with some frequency over at least a 6–year period satisfied the "relationship and continuity" requirement of a pattern of racketeering activity. *Id.* at ——, 109 S.Ct. at 2906. Courts in this Circuit, applying the requirements of *H.J. Inc.,* have upheld

RICO claims in which the predicate activity covers an extensive period of time. *See, e.g., Polycast Technology Corporation v. Uniroyal, Inc.,* 728 F.Supp. 926 (S.D.N.Y. 1989) (complex, multi-faceted conspiracy to defraud numerous officers and shareholders, spanning 8½ months, met pattern requirement); *Beres v. Thomson McKinnon Securities, Inc.,* 1989 WL 105967 (S.D.N.Y. 1989) (series of related predicate acts over 5–year period, which threatened to continue, stated a pattern of racketeering activity); *Reinfeld v. Riklis,* 722 F.Supp. 1077 (S.D.N.Y.1989) (substantial racketeering activity lasting seven months, relating to business transaction, establishes RICO pattern because of inference of continuity); *Perez–Rubio v. Wyckoff,* 718 F.Supp. 217 (S.D.N.Y.1989) (comprehensive scheme spanning a period of six years, with common methods and a common purpose, met relationship and continuity requirements). Courts have also upheld shortlived schemes which threatened continued criminal activity. *See, e.g., United States v. Kaplan,* 886 F.2d 536 (2d Cir.1989) (two predicate acts of bribery stated pattern in context of defendant's willingness to facilitate corruption generally in the Parking Violations Bureau); *Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.) (en banc) (single mailing of fraudulent documents to thousands of persons, with basis to infer that similar mailings would be made in the future, sufficiently stated RICO pattern), *vacated for further consideration,* ── U.S. ──, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *upheld by* Order of September 15, 1989, 893 F.2d 1433. When, on the other hand, the predicate acts were "closed-ended" and spanned only a short period of time, i.e., a few weeks or months, courts have not hesitated to dismiss RICO claims. *See, e.g., Airlines Reporting Corporation v. Aero Voyagers, Inc.,* 721 F.Supp. 579 (S.D.N.Y.1989) (uncomplicated, closed-ended, single scheme, with few participants and one victim, and with acts of mail fraud occurring over thirteen months, did not pose threat of continuity); *West Mountain Sales, Inc. v. Logan Manufacturing Co.,* 718 F.Supp. 1084 (N.D.N.Y.1989) (period of racketeering activity lasting less than four months not sufficient to allege continuity).

Here, USA has failed to plead facts indicating that Jones' conduct presented a threat of continuity sufficient to establish a pattern of racketeering activity. The racketeering activity alleged spanned only three and a half months, and involved relatively few purported criminal acts and few participants in an uncomplicated scheme directed only at USA. Courts analyzing the threat of continuity have found that "there is insufficient threat of continuity to support a RICO cause of action where the racketeering acts involved a brief period of time, ... relatively few criminal acts, ... an uncomplicated scheme, ... few participants, ... and few victims." *Airlines Reporting Corporation v. Aero Voyagers, Inc.,* 721 F.Supp. at 584 (citations omitted) (collecting cases). Most importantly, whatever fraud Jones perpetrated on USA with respect to the date on which it planned to breach the Affiliation Agreement (October 3, 1988, as opposed to January 1, 1989) ended when Jones cancelled USA from two-thirds of its subscribers on October 3, 1988. At that point, all that remained of Jones' alleged fraudulent scheme was its failure to reveal the backdating of the termination letter. This failure may have left USA uncertain about the strength of its legal case against Jones for breach of contract, since the backdating strongly indicates that Jones' notice was indeed untimely. The alleged purpose of Jones' fraudulent scheme, however, was essentially accomplished on October 3, 1988. There simply is no indication of any threat on the part of Jones of continuing criminal activity beyond November 23, 1988.

Because USA's allegations fail to satisfy the "continuity plus relationship" requirement mandated by the Supreme Court in *H.J. Inc.,* which emphasized that Congress enacted RICO to address "long-term criminal conduct" and that criminal conduct "extending over a few weeks or months" does not meet this requirement in the absence of a threat of continuity, *H.J. Inc.,* ── U.S. at ──, 109 S.Ct. at 2902, USA's RICO claim is dismissed with prejudice.

## CONCLUSION

In sum, on the breach of contract claims, USA's motion for summary judgment on liability in its contract claims is granted, and Jones' motion for summary judgment is denied. Jones' motion to dismiss USA's common law fraud and tortious interference with contract claims is denied, but Jones' motion to dismiss USA's RICO claim is granted. Finally, USA's motion for summary judgment on its tortious interference claim is denied.

SO ORDERED.